### Mildred Clifton v. The State.

#### No. 3076.        Decided December 17, 1904.

**1.—Manslaughter—Charge of the Court—Harmless Error.**

If it be conceded that the court's charge on manslaughter was erroneous in not submitting the question of an intentional killing to the jury, still if the facts show that manslaughter was the lowest grade of homicide of which the jury could find appellant guilty, that is, that negligent homicide is not in the case, the error of the court in his charge on manslaughter would not affect appellant. Davidson, Presiding Judge, dissenting.

**2.—Same—Fact Case—Negligent Homicide.**

See opinion for facts which did not call for a charge on negligent homicide and which disclose an intentional killing. Distinguishing Reddick v. State, 47 S. W. Rep., 993.

Appeal from the District Court of Tarrant. Tried below before Hon. Irby Dunklin.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*McLean & Scott* and *Parker, Dunn & Parker,* for appellant.—The court, in the charge on manslaughter, authorized the jury to convict of that offense regardless of whether or not there was an intent to kill; this was error, and was injurious to defendant for the reason that the issue of negligent homicide is most strongly raised by the facts and the jury was authorized to convict although they believed the testimony of State's witness Rube Black and that the killing was the result of negligence or carelessness upon defendant's part, with no apparent intention to kill. Reddick v. State, 47 S. W. Rep., 993; art. 51, Penal Code; art. 717, Penal Code; Dunforth v. State, 44 Texas Crim. Rep., 105; Jennings v. State, 7 Texas Crim. App., 357; Bruner v. State, 58 Ind., 159; Murphy v. State, 31 Id., 511; Norton v. State, 98 Id., 347; Adams v. State, 65 Id., 565; McLaughlin v. State, 10 Texas Crim. App., 340; Miles v. State, 1 Id., 510.

*Howard Martin,* Assistant Attorney-General, and *O. S. Lattimore,* for the State.—As we understand the doctrine of all our cases, beginning in 25 Texas Sup. Ct., followed by Aiken v. State, 10 Texas Crim. App., 610, to which we call especial attention, as also to Thompson's case, 24 Texas Crim. App., 383; if one does an act, using such means and in such manner, and at such time and place, as that within the reasonable scope of such act, lie the death or serious bodily harm of another, and death result, same will be murder or manslaughter, according as the elements of passion, adequate cause, etc., are present or absent. One may not with a pistol, a weapon ordinarily deadly, shoot along a public street, where are known to be persons at the time, and point the same at such persons, and say nothing more than "lie down" or "run" or "stop," and thereby inject any issue less than manslaughter in the case.

The record here discloses that the court drew a clear distinction between manslaughter and negligent homicide, because the court told the jury in the negligent homicide charge, that if she shot with no apparent intention of killing Patterson, or any other person, etc., she should be convicted of negligent homicide. They had been previously told that manslaughter was voluntary homicide, etc., and that if she shot him under the immediate influence of sudden passion, toward Patterson, or toward some other person, they should find her guilty of manslaughter.

Construing this altogether, the jury were clearly told that in the absence of apparent intent to kill, they could not convict of the lowest grade. They found beyond a reasonable doubt that there was an apparent intent to kill. Hence their refusal to let her out under the negligent homicide feature.

HENDERSON, JUDGE.—Appellant was convicted of manslaughter, and her punishment assessed at four years confinement in the penitentiary; hence this appeal.

We will state enough of the facts in order to discuss the question raised as to the charge on manslaughter, and incidental to this, the court's charge on negligent homicide. The homicide occurred in the city of Fort Worth, about 3 o'clock on the morning of December 23rd, 1903. Deceased, Ab Patterson, in company with Albert and Beatty Brown, Arch Stewart, and Lish Ball (farmer boys living in Johnson County, then visiting in Forth Worth) went to the bawdy house kept by appellant. Upon their arrival they found another man, who was a stranger to them, and has not been seen since the homicide. A short time after they entered one of the parlors, the stranger complained of being cold and started to make a fire. Appellant told him not to do so; but he insisted, and put a piece of coal in the stove. Appellant immediately went around the stove towards the stranger, and he left the room, going into the hall, appellant following. One or two of the witnesses testified that they heard something like a lick struck at the front door; did not know whether the lick was struck by the stranger or by appellant. Deceased and his companions passed out the front door on to the gallery, immediately behind the stranger. Appellant remained at the door. As soon as they passed out, some of the witnesses for the State testified that she called for a gun, and when they had proceeded down the sidewalk some eight or ten steps, toward the corner of the next street, she fired. Deceased and his companion proceeded down the street, and just after they turned the corner, deceased began to stagger. One of his companions asked what was the matter, and he said, "I am killed," and immediately fell and expired. Two or three persons in the house with deceased positively identified appellant as the person who stood upon the gallery and fired the shot. One of the State's witnesses, to wit: Stewart testified: "After we got up and started, this woman stood and held the door until we got out. She closed the door, and we got out to the bottom of the steps, and had taken four or five steps maybe, I don't remember how far we had gotten; when she opened the door again. When she opened the door she had a pistol in her hand, and just came with the pistol in her hand and shot, and we started to run, and she shot right in the crowd. We started to run, and when we got to the corner, deceased staggered like a drunken man, and immediately afterwards fell." This witness also stated that he heard appellant say something after they had gotten out of the door. She says, "hand me a gun or pistol." Another witness, Rube Black, not with the crowd of boys in the bawdy house, passed there on his way to work. He states: "When I passed by Mildred Clifton's, there was a crowd of boys standing on the sidewalk, probably half a dozen. I first saw a crowd of boys, about half a dozen, and a hack in front of the house, and I saw a woman open the door and come out on the gallery, and says: 'Run, you sons of bitches, run,' and she put her hand on the post and fired. Then she turned

and walked back in the house; and there was a young lady on the inside of the door. She asked, 'Did they run?' And she said, 'Yes, the sons of bitches run.' She fired with a pistol pointed toward the boys, kinder southeast of her front door. When she said 'run, you sons of bitches, run,' and fired, the boys ran south." Appellant by her own testimony denies the entire transaction. She and other witnesses, inmates of the house of prostitution, testified that no shot was fired from the front gallery of the house that night. This is a sufficient statement of the case in order to present the assignments relating to the charge of the court.

The court gave the general definitions of manslaughter; among other things: "That manslaughter is voluntary homicide committed under the influence of sudden passion, arising from an adequate cause, neither justified nor excused by law." In applying the law of manslaughter to the facts, the court uses this language: "If you believe from the evidence, beyond a reasonable doubt, that Mildred Clifton the defendant, did, in Tarrant County, Texas, on or about the 23d day of December, 1903, and before the filing of the indictment read to you, unlawfully kill Ab Patterson, by shooting him with a pistol, and that said killing was committed under the immediate influence of sudden passion on the part of the defendant toward Ab Patterson or towards some other person as the expression 'sudden passion' is above defined, and that said sudden passion arose from an adequate cause, as the expression 'adequate cause' is above defined, then it will be your duty to find the defendant guilty of manslaughter and assess her punishment at imprisonment in the State penitentiary for some period of time not less than two nor more than five years; but unless you so believe from the evidence beyond a reasonable doubt, then you will acquit the defendant of manslaughter."

The court gave a definition of negligent homicide of the second degree, and then instructed the jury as follows: "If you believe from the evidence beyond a reasonable doubt that Mildred Clifton, the defendant, did, in Tarrant County, Texas, on or about the 23d day of December, 1903, kill Ab Patterson by shooting him with a pistol, and that said killing occurred on a public street in the city of Fort Worth, and if you further believe from the evidence that at the time of said shooting there was an apparent danger by said shooting of causing the death of said Ab Patterson or some other person, and that there was no apparent intention to kill Ab Patterson or any other person, then you will find the defendant guilty of negligent homicide of the second degree and assess her punishment at confinement in the county jail, for some period of time not exceeding three years, or by a fine in some sum of money not exceeding three thousand dollars; but unless you so believe from the evidence you will acquit the defendant of negligent homicide of the second degree."

The contention of appellant is that the charge on manslaughter omitted to instruct the jury that the killing must be intentional; and the effect of it was to leave the jury with no criterion or distinction between negli-

gent homicide of the second degree and manslaughter. An inspection of the charge of the court, when applying the law to the facts in manslaughter shows that the court did omit to tell the jury that the homicide must be intentional, still the jury were authorized to look back to the court's definition of manslaughter, in which they were told that the killing must be voluntary, that is, intentional. However, if it be conceded that the court's charge on manslaughter was erroneous in not submitting the question of an intentional killing to the jury, still, if the facts here show that manslaughter was the lowest grade of homicide of which the jury could find appellant guilty, that is, that negligent homicide is not in the case the error of the court in its charge on manslaughter would not affect appellant. In our view of the facts, negligent homicide is not in the case; and the court was not authorized to charge on that subject. Our statute requires that in negligent homicide there be no apparent intention to kill. Here, if negligent homicide of the second degree is an issue in the case, it must arise from the State's testimony alone, inasmuch as appellant cuts herself off entirely from any participation in the homicide. If the witnesses for the State showed that appellant was using the pistol merely to frighten the stranger or the crowd of boys with deceased, and it was incautiously or accidentally discharged, she not intending to kill or injure, merely to alarm them, there might be something in appellant's contention, if the court had failed to discriminate in his charge between manslaughter and negligent homicide. But we do not so understand the testimony. As heretofore stated, the witnesses who testified on this point show that she pointed the pistol at or towards the parties, and fired, exclaiming "run, you sons of bitches, run." It can hardly be claimed from this evidence that pointing a pistol at a person and firing it, indicated no apparent intention to kill. This is not like the case of Reddick v. State, 47 S. W. Rep., 993, relied on by appellant. In that case there was direct testimony to the effect that Reddick did not intend to kill his son, but fired his pistol merely to frighten him, and beside his intention, shot him. In this case, as stated, appellant and her witnesses cut herself off entirely from the transaction; and the evidence of the State's witnesses show an apparent intention to kill, in pointing the pistol and firing it into the crowd. We do not think the circumstances, in connection with the testimoy given by the State's witnesses, could be interpreted into an act of negligence merely, not evidencing an apparent intent to kill. Appellant was evidently angered, either at the stranger (if it can be gathered that he gave her a lick at the door) or because the crowd was leaving. She evidently believed the stranger was in the crowd, as the evidence shows he left about the same time. They were not hurried in their movements, but walked slowly, and gave her opportunity to open the door again, call for the pistol, return and fire when they had only gotten about ten steps from the gallery. We fail to see under these circumstances any issue of negligent homicide. As to manslaughter, as stated before, appellant was

found guilty of that offense, and any error in the charge as to that matter passes out. The judgment is affirmed.

*Affirmed.*

Davidson, Presiding Judge, dissents.

### ON REHEARING.

### February 8, 1905.

HENDERSON, JUDGE.—The judgment was affirmed at the Tyler Term (11 Texas Ct. Rep., 736), and is now before us on rehearing. Appellant strongly insists that the court was in error in holding that the issue of negligent homicide was not in this case. To support her contention, in addition to the authorities already furnished, she cites us to Curtis v. State, 22 Texas Crim. App., 227. She urges that the facts of that case are no stronger than the facts of this case; and that the court there reversed because negligent homicide was not charged. We have examined that case carefully, and, in our opinion, the facts of that case presenting the issue of negligent homicide are stronger than here. Even there the court says, "the evidence in support of this phase of the case may not be satisfactory or even strong, still there are facts in proof which fairly present the issue," etc. The facts there show that it was Christmas night, and the people of the little town of Bartlett were enjoying the occasion by shooting fire-works. Deceased and Barnett procured some roman-candles, and furnished them to some boys to fight a duel with. Deceased and witness went from the back end of the store-house to the front to see the roman-candle duel. Deceased passed into and through the east door and witness then entered the west door, when he heard some one on horseback near the gallery exclaim, "God damn, I will shoot or turn her loose." Somebody in the crowd gathered about the street said, "Yes, God damn her; turn her loose," and then a pistol fired. The party who did the shooting was sitting on a gray horse at the west end of the gallery, and was stooping forward when the first shot was fired. When witness first looked, party was in the act of drawing his pistol and had it pointed toward witness. Witness could see the arm and the pistol. He heard it snap and fell backwards in a barrel of cocoanuts. Directly other shots were fired: in all four or five. After the shooting deceased was found to be wounded. All of the witnesses testify to the effect that the man who did the firing was on a gray horse in the street, some six or eight feet from the gallery where deceased and others were standing; that deceased was standing obliquely to the rear of the party doing the firing. Some ten or twelve persons on horses were in the street, among them were three on gray horses; besides the crowd gathered around. It is not certain which shot took effect in deceased, but we gather it was the first or second shot. Witnesses testify that it was a frolic they were having, and everything seemed to be in fun; did not see or hear anything to indicate ill will or bad feelings on the part of anybody. There was some testimony tending to show that ill will existed between appellant and deceased sometime before. It

does not occur to us that the testimony here showed that the pistol was used maliciously or that under all the circumstances of the case, there was any intention to shoot any one in the crowd when defendant fired his pistol. Here the facts are different. The testimony shows that appellant had just had an altercation with a party who left her house immediately before or with the crowd of boys; that she pointed her pistol directly at the crowd, and said, "Run, you sons of bitches, run," as she fired; as tending to show guilty knowledge on her part. Afterwards when she learned that one of the boys had been shot, she denied having fired the pistol at all. We do not believe the facts of this case bring it within the facts of the Curtis case, supra, and do not believe the court was required to give a charge on negligent homicide.

The motion for rehearing is overruled.

*Overruled.*

Davidson, Presiding Judge, absent.

December 20, 1904.

DAVIDSON, PRESIDING JUDGE (dissenting).—I cannot agree to this affirmance. Appellant's punishment was assessed at four years confinement in the penitentiary under a conviction for manslaughter. The charge of the court in regard to manslaughter and negligent homicide is criticised, and upon these criticisms a reversal is sought. On the morning of December 23rd, about 3 o'clock, Ab Patterson was shot and killed. Deceased, Albert Brown, Beatty Brown and Lish Ball were in one of the parlors of a house of ill-fame, kept by appellant. There was another man present, who was a stranger. The young men were doing nothing particularly, just sitting in the parlor. Trouble came up between the stranger and appellant. "The stranger made a remark about the weather being cold, and got up to put some coal in the stove; and the woman, whom the State's witness shows was appellant, came in and ordered him not to put the coal in the stove. He said that he guessed he knew what he was doing, or when he got cold, or something of the kind, and threw a chunk of coal in the stove. The woman standing in the door started from the door around the stove, and came around the stove after him; they went on to the door. When they got to the door, there was trouble between the woman and man who had undertaken to put coal in the stove, and she either hit him or he hit her." The witnesses did not seem to know; did not see the difficulty clearly, but there was a fight or "hitting," between appellant and the stranger at the door. The stranger went out, and deceased and his crowd immediately followed: the woman holding the door until they all passed out. It is left rather uncertain whether the woman closed the door at that particular juncture. Some of the witnesses swear that she did. As the young men reached the bottom of the steps, and had taken perhaps four or five steps, the woman opened the door, having a pistol in her hand, and shot. The young men ran to the corner of the street, where deceased staggered and fell, remarking, in reply to a question, "Yes, I am shot; I am killed." He

died immediately. This is practically the substance of the testimony of the three young men who were with deceased. The stranger did not testify, and seems to have utterly disappeared. It is also in testimony that immediately after deceased and companions got out of the door, the woman said, "hand me a gun or pistol," or an equivalent expression. Black testified that on December 23rd, about three o'clock in the morning, he was riding on Rusk street, going to his place of business, and saw five or six persons in front of appellant's house, and a woman come out on the front gallery, and called out, "Run, you sons of bitches, run;" that she put her hand upon the post and fired, then turned and walked back in the house. There was also a young lady on the inside of the door, who asked, "did they run?" and the woman firing the pistol remarked, "Yes, the sons of bitches run." She fired with a pistol, pointed towards the boys, "kinder southeast of her front door." When she said, "Run you sons of bitches run," and fired, the boys ran south. This witness did not know who the woman was, described her as being a tall woman with black hair, and the woman with her at the door as a "low, heavy, stout woman," not as tall as the other. Only one shot was fired. This witness testified further that he saw a hack in front of the house. The three young men who came out of the house immediately behind the stranger, testified they saw nothing of the hack or of anybody passing the street at the time of the trouble.

It is contended upon this state of facts, the court erred in not charging the law of manslaughter correctly. The general statutory definition of manslaughter was given, to wit: a voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified nor excused by law. Then follows the general definition of sudden passion and adequate cause. The law, as applied to the facts, in the charge is, as follows: "If you believe from the evidence, beyond a reasonable doubt, that Mildred Flifton (defendant) did in Tarrant County, on or about the 23th of December, 1903, and before the filing of the indictment read to you, unlawfully kill Ab Patterson, by shooting him with a pistol, and that said killing was committed under the immediate influence of sudden passion on the part of the defendant toward Ab Patterson, or towards some other person, as the expression 'sudden passion' is above defined, and that said sudden passion arose from an adequate cause, as the expression 'adequate cause' is above defined, then it will be your duty to find defendant guilty of manslaughter." This charge is criticised, because it fails to inform the jury, first, that the homicide to be brought within manslaughter must be an intentional or voluntary killing, and, second, that under the facts this charge was misleading and authorized a conviction upon a state of case which would form the predicate of negligent homicide, and that the proper distinction is not drawn between the two offenses. We are of opinion this criticism is correct. In order to constitute manslaughter, the adequate cause and sudden passion arising, there must be a voluntary or an intentional kill-

ing.  If the pistol was fired to frighten, with no intention to kill, it could not be manslaughter, and the State's evidence suggests the killing might have occurred under that state of case.  It is also criticised because the charge does not submit one of the real issues of the case, and that in using the words "towards Ab Patterson or towards some other person," is not a sufficient presentation of one of the main features presented by the evidence.  It occurs to me this criticism is correct.  It will be noted, under the facts shown by the three young men, friends of and in company with deceased, that they left the house immediately in the rear of the stranger who had the difficulty with the woman and had perhaps struck her at the door, which seems to have angered and enraged her.  It will be further noted, under the statement of facts, these were all strangers to appellant, and when she came in the room where the young men were, it was for the purpose of stopping the "stranger" from putting coal in the stove, which brought about the difficulty between herself and the stranger.  If the stranger struck her and it caused her pain, and her passions were aroused to the extent of rendering her mind incapable of cool reflection, or to suggest the issue of manslaughter if he had been killed, the court should have changed the jury, under this state of case, not the general expression "toward some other person," but if they believed her mind was enraged to such an extent as that it was incapable of cool reflection towards this stranger, and she shot at him and killed Ab Patterson, then the jury might convict of manslaughter; or if she shot at deceased thinking it was the stranger, she would be entitled to a charge on manslaughter from that standpoint.  In other words, if sudden passion was engendered by her difficulty with the stranger at the door, and she immediately got her pistol, and while in this condition of mind, shot at the stranger and killed Ab Patterson, it would be manslaughter; or if she shot and killed Ab Patterson, believing it was the stranger, it would be manslaughter.  There is nothing in the record indicating she was aware the stranger alluded to, was not a visitor there with and a friend of the other young men.  The testimony places them in the parlor together and leaving practically together, and she found, under the testimony of Black, a group of five or six men standing on the sidewalk, a few steps from her door at the time she fired.  There was no trouble between deceased and the woman, and no witness testified to any trouble between her and the deceased There was no occasion for her anger or resentment, except towards the stranger who had immediately preceded the other young men from the door out on to the street.  Under their testimony, only four of the boys should have been on the street, including deceased; but the witness Black places five or six there.  She was aware of the fact that five persons had just left her house.  If she believed the man with whom she had the difficulty was one of the group, and shot at the one she believed to be her antagonist and by mistake killed the other man, she would be as much entitled to a charge on manslaughter as if she had killed her real antagonist.  We do not believe it is an answer to this that her convic-

tion was only for manslaughter. The jury assessed the punishment at four years in the penitentiary. If they had believed Black's testimony, and further that her anger and resentment was towards the stranger, they might have reduced the punishment to the minimum, to wit: two years. Again, if she fired only to frighten and not to kill, then the conviction should have been for negligent homicide. This issue is presented by the testimony of Black. The court's charge does not sufficiently draw the distinction between negligent homicide and manslaughter. The charge on manslaughter is easily susceptible of the construction that a conviction for manslaughter could have been awarded by the jury, whether the homicide was intentional or accidental.

In regard to the court's charge on negligent homicide, it is contended it is not sufficiently specific. It should be more specific, and inform the jury pertinently that, if at the time appellant fired the shot, if she did, her purpose was only to frighten and not to kill, she would be guilty of no higher offense than negligent homicide. Reddick v. State, 47 S. W. Rep., 993. The principle announced in that case is applicable here. It is true in the Reddick case, the father testified he had no intention of killing his son at the time he fired, but shot only to frighten him. Now, if appellant testified that she had no intention to kill but to frighten, the Reddick case would be exactly in point; but he did point his towards his son and shot him to death. But where the purpose may be deducible from the circumstances, the charge is as applicable as if shown by positive evidence. Where there is a doubt as to such intent or purpose of the party charged with the homicide, it is the duty of the court to solve that doubt in favor of the accused, under all circumstances and give in charge the law favorable to him. It is a basic principle of our criminal jurisprudence that a party accused of crime is entitled to the presumption of innocence and reasonable doubt, and this reasonable doubt applies to all the issues which may be suggested by the testimony, which are favorable or could be held favorable by the jury to the accused in passing upon the testimony and the credibility of the witnesses. If the jury, under the facts introduced by the State should find that in shooting the pistol it was done to frighten and not to kill, appellant was entitled to a verdict of negligent homicide. This and all other issues in cases of this character should be presented pointedly and not inferentially or negatively.

I have treated this case from the standpoint of the State's testimony altogether. Defendant herself testified, and introduced several witnesses who swear she did not fire the pistol; that she was in another room of the house at the time of the firing and had no connection with it in any manner, and knew nothing about it. There was another witness introduced, who stated he was traveling along the street at the time the shot was fired, and that the shooting did not occur at the house but out on the street, away from the house, and near the corner of the street where deceased was shown to have fallen and died. If the testimony for defendant is true, she was entitled to a verdict of not guilty. The wit-

nesses in the house deny the fact that there had been any trouble between appellant and any one. No pistol was found about the house, and appellant denied having one. The testimony for the defense is very full along these lines. I therefore believe the judgment should be reversed.