JOHN CRUTCHFIELD V. STATE.

No. 1911.  Decided November 27, 1912.

Rehearing granted January 22, 1913.

1.—Murder—Continuance—Want of Diligence.

Where, upon trial of murder, which lasted some five or six days after the application for a continuance was overruled, no effort was made to locate the alleged absent witnesses either before the process was issued or at any time thereafter, and one of the said witnesses attended the trial and was not introduced, there was no error in overruling the motion. Following Giles v. State, 66 Tex. Crim. Rep., 638, 48 S. W. Rep., 317.

2.—Same—Special Venire—Practice in District Court.

Where the court, if not fully and literally, complied with the law in ordering a special venire, the issuance of the writ, the service and the return thereof, and no injury was shown to the defendant, there was no error.

3.—Same—Evidence—Witness for State.

Where it was shown that one of the State's witnesses gave material testimony for the State, and it developed that he had been arrested for the murder for which defendant was being tried, there was no error in showing that he had never been indicted by the grand jury for said offense.

4.—Same—Argument of Counsel—Bill of Exceptions.

Where the bill of exceptions did not show that the remarks of State's counsel to the jury were uncalled for, and stated nothing else in connection with said remarks to point out any error, and no special instruction was requested and the court orally withdrew said remarks from the jury, there was no error. Following Clayton v. State, 67 Texas Crim. Rep., 311, 149; S. W. Rep., 119.

5.—Same—Charge of Court—Aggravated Assault.

Where, upon trial of murder, defendant was convicted of murder in the second degree, and the evidence did not raise the issue of aggravated assault, there was no error in the court's failure to charge thereon.

6.—Same—Deadly Weapon—Shotgun—Means Used.

Where, upon trial of murder, the evidence showed that the homicide was committed with a double-barrel of a shotgun which was used as a bludgeon and crushed the skull of deceased from which he died, and said barrel of said shotgun was introduced in evidence and handled by the jury, the jury could not have been aided by the mere statement of a witness that this was a deadly weapon and the omission of such testimony was not reversible error under the charge of the court.

7.—Same—Charge of Court—Unlawful Killing—Intent to Kill.

Where, upon trial of murder, the evidence showed that the deceased had been killed with the double-barrel of a shotgun detached from the stock, and the facts pointed to the defendant as the party who did the killing who denied it, and there were no circumstances raising the issue of self-defense accidental, or unintentional killing, and the court properly charged on the different degrees of murder and manslaughter, applying the same to the facts in evidence, there was no reversible error in the court's failure to require the jury to find that the defendant intended to kill or that the killing was unlawful.

8.—Same—Charge of Court—Murder in the Second Degree.

Where defendant was acquitted of murder in the first degree and convicted of murder in the second degree, the court's charge on murder in the first degree need not be considered,

**9.—Same—Charge of Court—Deadly Weapons—Intent to Kill.**

Where the evidence showed an unlawful and intentional killing and the instrument used and the manner of its use produced the death of the deceased, and the court properly charged the jury on both degrees of murder and manslaughter, who found the defendant guilty of murder in the second degree, there was no error in the court's failure to specifically require the jury to find that it was the specific intent of the defendant to kill.

**10.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder and a conviction of murder in the second degree, the evidence sustained the conviction, there was no error.

**11.—Same—Rule Stated—Charge of Court—Article 743.**

The charge of the court must always be tested with reference to the evidence introduced and must be pertinent thereto, and in criticisms of the charge, this court will pass upon the whole of the charge, and under Article 743, Code Crim. Proc., it will not reverse a case unless the error appearing of record is calculated to injure the rights of defendant.

**12.—Same—Charge of Court—Murder in Second Degree.**

Where, upon trial of murder and a conviction of murder in the second degree, the defendant set up no other defense except that he did not do the killing, and the evidence showed an unlawful intentional killing and pointed to the defendant as the man who did it, there was no error in the court's failure to require the jury to believe that the killing was unlawful and intentional, the court's charge on murder in the second degree being full and correct and applicable to the facts.

**13.—Same—Rule Stated—Charge of Court—Malice.**

The mere omission in a particular paragraph of the court's charge, in a trial for murder, to require the killing to be unlawful or upon malice does not vitiate a proper charge on murder in the second degree where the facts required to be found, both as a matter of law and as a matter of fact, would make the killing unlawful and stamp it inevitably as of the grade of murder in the second degree. Following Puryear v. State, 56 Texas Crim. Rep., 333.

**14.—Same—Presumption of Law—Intent to Kill Presumed.**

If the weapons or means used by defendant were calculated to effect the purpose of murder or serious bodily injury, it is an absolute presumption of law that it was the intention of the defendant to effect the purpose indicated.

**15.—Same—Practice in District Court—Charge of Court.**

While it is the better practice to require the jury to believe by the court's charge that the killing was both unlawful and intentional, yet, where on trial of murder, defendant denied the killing and set up no other defense and the evidence shows an intentional killing and pointed to him as the guilty party, there was no error under Article 743, Code Crim. Proc., in the court's failure to specifically require the jury to find as a prerequisite to defendant's guilt that the killing was unlawfully and intentionally done; besides, the court's charge did so substantially require when taken as a whole.

**16.—Same—Misconduct of Jury—Verdict by Lot—Affidavit.**

Where the question of the misconduct of the jury was raised for the first time on motion for rehearing in this court, the same came too late; besides, the affidavits attached to the motion were made before counsel for defendant and could not be considered. Following Maples v. State, 60 Texas Crim. Rep., 169, and other cases.

Appeal from the District Court of Young. Tried below before the Hon. P. A. Martin.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*W. E. Fitzgerald* and *John P. Simpson* and *J. W. Akin,* for appellant.—On question of continuance: Rushing v. State 62 Tex. Crim. Rep., 309, 137 S. W. Rep., 372; Wilman v. State, 63 Tex. Crim. Rep., 623, 141 S. W. Rep., 110; Davis v. State, 63 Tex. Crim. Rep., 453, 141 S. W. Rep., 264; Keys v. State, 60 Tex. Crim. Rep., 279, 131 S. W. Rep., 1068; Roquemore v. State, 54 Tex. Crim. Rep., 592, 114 S. W. Rep., 140; Jones v. State, 55 Tex. Crim. Rep., 123, 113 S. W. Rep., 928.

On question of the court's charge on murder in the second degree; Smith v. State, 57 Tex. Crim. Rep., 585, 124 S. W. Rep., 679; Clark v. State, 51 Tex. Crim. Rep., 519, 102 S. W. Rep., 1136; Abbata v. State, 51 Tex. Crim. Rep., 510, 102 S. W. Rep., 1125; McMillan v. State, 58 Tex. Crim. Rep., 525, 126 S. W. Rep., 875.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—On September 7, 1911, appellant, John Crutchfield, was indicted for the murder of his brother, Tom Crutchfield, alleged to have occurred March 31, 1911. He was convicted of murder in the second degree and his penalty fixed at ten years confinement in the penitentiary.

A few days after the alleged murder an examining trial was had when, it seems, practically all of the witnesses were heard. One or two besides appellant who were gambling at appellant's house that night were held under bond to answer said charge. When the grand jury convened at the next term of the District Court in September, 1911, it seems that only appellant was promptly indicted for the murder.

The record and statement of facts is voluminous, though the material facts are few. On the night of March 31, 1911, some five or six other parties, in addition to John and Tom Crutchfield, gathered at John Crutchfield's residence near the mining town of Newcastle in Young County, to gamble and all of the persons so gathered for that purpose, including John and Tom Crutchfield, except one, did gamble practically from about 8 o'clock of the night of the 31st continuously until the next morning or during the night till about 4 o'clock. All of the parties were heavily drinking intoxicating liquors during the whole time and some, if not all of them, were more or less drunk. There were some rows and threatened fights between some of the parties during the night, but no actual fights and apparently no one hurt until just as all of the other parties, except John and Tom Crutchfield, had left or were in the act of leaving. Tom Crutchfield lived and was living at that time with his brother John. Tom was unmar-

ried; John was married, had a wife and one small child at the time. John, his wife and child slept in a two-room house; Tom in a tent some short distance from the house. The gambling and drinking that night was carried on in the tent and therein is where injuries to deceased occurred which resulted in his death.

The State proved by its witness Birdwell, which was not disputed, that he had known John and Tom Crutchfield for some time prior to this killing; that some two or three weeks before the killing he had a conversation with John about him (John) and Tom; that appellant then said to this witness that he and Tom were going to have a fight some of these times and it would be a bad one too. The evidence further shows that for some time while the gambling between the parties was in progress, John and Tom Crutchfield were in the games and were betting and losing money. All the parties did not gamble and were not engaged in the games all the time,—usually four were gambling at the same time. Some of these would drop out occasionally and others would take their places. In one game when John and Tom were engaged therein, both being pretty drunk, and apparently money to some amount was at stake, the Crutchfields lost, which made John mad at Tom and he thereupon cursed him, telling him he didn't have any sense and didn't know how to play poker, and ordering him to get out of the game before he lost all of his money and that of John too, and that he was making a fool of himself. Tom then did get out of the game and did not engage in any other during the night, though he was present during the gambling practically all the time until the crowd broke up just about 4 o'clock in the morning of that night. At one time during the night when a row came up between two of the other persons present, it seems Tom went into the house where John's wife was and got John's double-barrel shotgun and took it into the tent and made some play therewith with one of these parties, but upon learning that he was mistaken about which one had a pistol he put up the gun and apologized. It is not clear whether he took the gun back in the house or not. At any rate, he put the gun away and is not shown to have had it any time later except in attempting to wrench it from John as hereinafter shown. For some time after John had ordered Tom not to gamble any more and Tom quit, the gambling between others continued, John engaging in some of the games. Later he got out of the game, and some time after this first trouble between John and Tom, the other parties' attention was called to the fact that John and Tom were over in another part of the tent quarreling and John was cursing Tom and Tom said to John, "You would not hit me or hurt me would you, me being your brother?" John replied, "God damn you, I had just as soon hurt you as any one else." Tom said, "No you would not hurt me being my brother. I would not curse you or hurt you. I would be ashamed to." John replied, "I had just as soon curse you as anybody." Another witness testified that John shook his fist at Tom and told him he would knock him down

and kept cursing him and that among other things, Tom said, "John, you can't hit one side of me." Another witness on this point, stated that John said to Tom, "I will whip you," and Tom replied, "You can't whip one side of me," and "you would not whip your brother or hit him would you?" and John said, "I just as soon hit you as any other damn man." Just about this time or immediately before, some of the parties began to leave the tent and had gotten out, leaving only about two of the parties other than John and Tom in the tent. John and Tom began struggling each to get said double-barrel shotgun, John having hold of the barrels and Tom the stock. These persons interfered and attempted to take the gun from both of them or keep either of them from getting it. In their struggles and wrenching around they landed on the bed. One of these witnesses got between them and sat down on the gun. Another one and Tom had hold of the stock, John hold of the barrels and in wrenching it, each in trying to get it, they broke off the stock from the barrels. The other two persons at once left the tent, leaving in it only John and Tom. Soon after getting out of the tent these two last persons to leave, as well as some others, who were very near, heard scufflings and sounds like something falling, or somebody shuffling and running over things in the tent. None of them went back in the tent and none of them knew what had occurred therein after they left.

The unquestioned testimony further shows, immediately after, or at the time of this last struggle between John and Tom for the possession of the double-barrel shotgun and the parties left, that Tom received a very heavy blow on the side of the head which crushed in his skull from an inch to an inch and a half deep and from two to three inches wide, and about three inches long, which was shown by physicians could have been made with the barrels of a double-barrel shotgun, and from which wounds Tom died within about two days. The theory of the appellant was that this wound was not inflicted by him but by someone else. The theory of the State was, and the proof was sufficient and unerringly established, that John and no one else inflicted it. The evidence nowhere points to any other than John as having inflicted this wound. John did not testify on trial. His wife did and said that he did not inflict it, but that some other, whom she did not recognize and could not describe, other than that he had on some light clothes, inflicted the wound and ran from the tent. The court on this point charged the jury at appellant's instance that if some other than John inflicted this wound or if they had a reasonable doubt of whether some other and not John inflicted it to find him not guilty.

It is not shown how far John Crutchfield's residence was from said town and livery stable therein, but we take it from all the facts, it must have been some little distance. About 5 o'clock that morning John (appellant) appeared at the livery stable of Mr. Bush in said town. It was still dark and night. John woke up Bush, who was in

bed asleep and told him he wanted to get a horse to go hunting his mules. Bush got up, dressed, went and got and saddled a horse for him. When he came back with the horse John said to him: "See this blood on my pants; I guess I have killed my brother." Bush replied that is too bad. John said, "How in the hell do you know about that," and again showed him the spattered blood on his pants and said he broke a double-barrel shotgun over his head, and "I guess I have killed my brother." He said that they had been playing poker and he did not win any money. Some two hours later, about 7 o'clock, he came back to this liveryman, inquiring where Doctor Jones lived, then stating to this witness that he guesses "they" had killed his brother. Still later and a third time when he came back to see this witness he called the witness off to one side and said, "I guess that fellow has killed my brother." In neither of these subsequent conversations did he say or intimate who "they" were or who "that fellow" was. It seems that in this second interview with the liveryman in which he said he reckoned "they" had killed his brother, he also again reiterated the statement that he had killed him. Another witness for the State, Tirey, testified that John (appellant) came to his house between 5 and 6 o'clock on that morning. The witness had not then gotten up, was still in bed, but upon being called by John, got up went out to him, found him riding said livery horse. Upon being invited by the witness to come in, he said, "Well, we played hell last night." The witness asked him, "What is that, John?" and he said, "I knocked my brother in the head," and upon being asked why he did that said some of the boys came over there last night and framed it up on him (appellant) and Tom went in with some of the boys and that is the reason he did it. That he stayed there and discussed the matter with this witness for some twenty minutes and that was all that was discussed between them. He asked the witness' advice about the matter and wanted to know of him what he (appellant) ought to do. He kept stating to this witness that he guessed he had killed his brother and he believed his brother would die. Doctor Jones for the State testified that John (appellant) came to him about 6 o'clock to get him to go and see his brother Tom. The Doctor asked him what was the matter with him and he said, "He is hurt." The Doctor then asked how he got hurt and John replied not to ask him, but to go over there as soon as he could and attend his brother. That he, the doctor, then dressed, went over to see Tom, getting there about 6:30, finding him with the wound as above stated and unconscious. That after examining Tom and finding him in that condition John came in the tent and Doctor Jones told him to go and get Doctor Mars, which John then did. He saw and called Doctor Mars between 7 and 8 o'clock that morning. Said Doctor Mars went over and found Doctor Jones in attendance upon Tom. Either at the time he first called Doctor Mars, or when going over from Doctor Mars' to Tom with him the doctor asked him what was the matter and how Tom

got hurt. Appellant told the doctor not to ask any question, but go and do what he could for his brother, and he did not state to the doctor how Tom had got hurt or who hurt him. Still later in the day John, at the instance of these doctors, called in Doctor Hamilton, who then called and saw Tom. All these doctors testify, in substance, that while Tom may not have been rendered immediately unconscious by the lick, that ordinarily such a lick would at once produce unconsciousness. Each testified that when they saw him he was unconscious and remained so until he died. They had him taken from John's home to another town that evening, or the next morning, where an operation was performed for the purpose of relieving him. The crushed skull was removed but blood clots had formed. The deceased never regained consciousness but soon after died from the effects of the wound, the operation being performed by said Doctor Hamilton assisted by others, or rather, others being present at the operation.

On September 13, 1911, the case was called for trial. Appellant then made a motion for continuance on account of the absence of several witnesses. It shows that while he was arrested on September 7th, on the next day he had process issued for these witnesses, which process was served on two of the witnesses the next day and that the others were not found. The process for these witnesses was returned before the application for continuance was filed, or the next preceding that. The trial lasted some five or six days after the application for a continuance was overruled. Appellant had no process whatever issued for any of these witnesses, after his application was overruled. We are clearly of the opinion that the application was correctly overruled for the lack of diligence to procure the said witnesses. No effort is shown to to have located them either before the process was issued, or any time after it was issued and no process was issued after the application was overruled and no diligence was shown to locate or get them. One of the witnesses is shown to have appeared later and been in attendance on the trial. Appellant did not introduce him as a witness. Giles v. State, 66 Tex. Crim. Rep., 638, 148 S. W. Rep., 317 and cases there cited.

No injury whatever is shown by appellant's bill complaining of the court's action about the special venire and the bill nowhere shows that any injury whatever occurred to appellant by the court's action therein. Under the circumstances, as therein shown, the court is shown to have substantially if not fully and literally, complied with the law in the ordering of special veniremen, the issuance of the writ, the service thereof and the return and all such like matters.

Among others, the State introduced Jim Crenshaw who was a material witness for the State and who gave pertinent testimony for the State. Upon cross-examination by appellant of this witness he testified that he at first was arrested and placed in jail charged with this murder, but was admitted to bail by an examining magistrate upon an investigation of the matter. On redirect examination the

court permitted the State to ask, and this witness to testify, that the grand jury had not indicted him for the offense. This certainly was proper as has uniformly been held by this court.

By another bill appellant complains of this language of the district attorney in his closing argument to the jury: "We have the guilty man, and I believe this jury is going to do like the jury did in the Beattie case in Virginia." This is the whole of the language complained of. The bill states nothing else in connection therewith, does not show what called for this remark, or that it was uncalled for, or anything else in connection with the case to show this court that it was error. The bill does show that immediately upon appellant objecting to the language the court sustained his objections and withdrew the statement from the jury. No special written charge was asked directing the jury not to consider it. Clayton v. State, 67 Texas Crim. Rep., 311, 149 S. W. Rep., 119, and to authorities therein cited.

Appellant has many complaints to the charge of the court and to the refusal of the court to give special charges requested by him and that the court did not submit aggravated assault to the jury for a finding. It is unnecessary to state the particulars of these various assignments. They all hinge around the contention that the double-barrel shotgun, with which unquestionably all the evidence established the murder was committed, was not specifically testified to by any witness as a "deadly weapon," and that the court did not submit to the jury in so many words and require a finding by them that the appellant intended to kill his brother at the time. If this was necessary under the facts of this case, then this judgment should be reversed. If not, in our opinion, it should be affirmed.

Of course, it is always necessary, in considering the charge of the court, to consider it as a whole and in connection with the facts of the case. The court in this case gave a full, fair and correct charge on murder in the first degree; also on murder in the second degree, and also on manslaughter. In our opinion, the evidence did not call for and the court was not under the necessity of giving any charge on aggravated assault. The jury having found appellant guilty of murder in the second degree, of course, acquitted him of murder in the first degree and it is unnecessary to discuss in any way the charge on murder in the first degree, other than to state, as above, that it is full, fair and correct, and the court, in submitting it to the jury for a finding, correctly applied the law to the facts.

The charge on murder in the second degree is likewise, as stated above, full, fair and correct, unless appellant's contentions are good. The court's charge on murder in the second degree is as follows:

"10. The next lower grade of homicide than murder in the first degree is murder in the second degree. Malice is also a necessary ingredient of the offense of murder in the second degree, the distinguishing feature, however, so far as the element of malice is concerned is; that in murder of the first degree malice must be proven to the

satisfaction of the jury, beyond a reasonable doubt, as an existing fact, while in murder of the second degree malice will be implied by the law from the fact of an unlawful killing.

"11. Implied malice is that which the law infers from or imputes to certain acts, however suddenly done; thus, when the fact of an unlawful killing is established and the facts do not establish express malice beyond a reasonable doubt, nor tend to mitigate, excuse or justify the act, then the law implies malice and the murder is in the second degree; and the law does not further define murder in the second degree than this: If the killing be shown to be unlawful and there is nothing in evidence on the one hand showing express malice and on the other hand there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice and the killing is murder in the second degree. The instrument or means by which a homicide is committed are to be taken into consideration in judging the intent of the party offending. If the instrument be one not likely to produce death in the manner used, it is not to be presumed that death was designed unless from the manner in which it was used such intention evidently appeared.

"12. If you believe from the evidence, beyond a reasonable doubt, that the defendant, John Crutchfield, struck Tom Crutchfield with a gun and that said gun, in the manner in which it was used, was an instrument reasonably calculated to produce death or serious bodily injury, and that said striking was with an instrument reasonably calculated to produce death or serious bodily injury and that said striking was in a sudden transport of passion, aroused without an adequate cause, and that by said stroke with said gun the said John Crutchfield killed the said Tom Crutchfield, then you will find the defendant guilty of murder in the second degree and assess his punishment at confinement in the penitentiary for any term of years not less than five years."

The court also correctly charged on presumption of innocence and reasonable doubt. Also reasonable doubt between the different degrees of homicide, as applied to murder in the first and second degrees and manslaughter:

We fail to find in the record any direct statement by any witness that the double-barrel shotgun used as a bludgeon was in specific terms a deadly weapon, but the gun was produced on the trial, identified and introduced in evidence, passed around to each juror and each juror took it in his hands and examined it. Its weight, length, etc., was not specially and particularly described by any witness, but as the gun itself was produced, introduced in evidence and personally handled and examined by each juror this was unnecessary. The gun itself thus introduced, examined and handled was superior evidence to any that a witness could have given of it by merely telling of its length, weight, etc. The jury for itself had this absolute knowledge from the evidence that was introduced and it could not have been aided

or disproved under the circumstances by the mere statement of any witness particularly describing it. There can be no shadow of doubt from this record that this gun was used by appellant on deceased and that it produced the death of the deceased. That it was reasonably calculated to produce serious bodily injury and death in this instance in the manner of its use as unquestionably shown, can not for one moment be doubted. The court in his charge as quoted above, correctly told the jury that "the instrument or means by which a homicide is committed are to be taken into consideration in judging the intent of the party offending. If the instrument be one not likely to produce death in the manner used, it is not to be presumed that death was designed unless from the manner in which it was used such intention evidently appeared." Then immediately following this charge he required the jury to believe from the evidence, beyond a reasonable doubt, that appellant struck deceased with a gun and that said gun, in the manner in which it was used, was an instrument reasonably calculated to produce death or serious bodily injury and that said striking was with an instrument reasonably calculated to produce death or serious bodily injury, and that said striking was in a sudden transport of passion aroused without adequate cause and that by said stroke with said gun appellant killed deceased, then to find him guilty of murder in the second degree. This charge was strictly in accordance with the law and was all that was necessary to be submitted or required to be found to show murder in the second degree. There might be a case where it was so questionable whether the instrument used was a deadly weapon or the manner of its use was such as to show an actual intent to kill that it would be proper to so charge, but this case does not present or require the submission of such questions. There is no claimed suggestion or intimation by the appellant or this record of self-defense, nor that he did not intend to kill, if he in fact struck the blow. Our statute (P. C. Art. 1140) is that every person who shall unlawfully kill a person with malice aforethought, either express or implied, shall be deemed guilty of murder. And, as stated by the charge of the court in this case, murder in the second degree is not otherwise defined than as stated specifically and fully in the charge of the court above quoted. That the killing in this case was unlawful can not for one moment be questioned. Neither can it be questioned from this record that it was willfully and intentionally done and neither can it be questioned from this record, that the instrument with which it was effected, in the manner of its use, as shown by what it did actually do, was not only likely but did actually produce the death in this case. So that there can be no question but that the instrument used in the manner in which it was used was a deadly weapon and the manner of its use was such as to unquestionably show that the intent was to kill.

Our law (P. C. Art. 51) is that the intention to commit an offense is presumed whenever the means used is such as would ordinarily

result in the commission of the forbidden act. Again (P. C. Art. 1147), is that the instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending. If the instrument be one not likely to produce death in the manner used, it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appeared.

It is only where the evidence raises a question of whether the instrument used was a deadly instrument and the manner of its use raises any question as to being sufficient to produce death or serious bodily injury that the court is called upon or required to require the jury to find that it was the intent of the slayer to kill. It is unnecessary to cite the decided cases on this subject and those applicable to this question, but see the sections of Judge White's P. C. under the articles above cited, and those under Secs. 1298, 1014, and 1270. In our opinion the charge of the court was correct in this case and none of appellant's assignments attacking it or his special charges should have been given.

There is no defect in the verdict of the jury, nor is there any reversible error pointed out by appellant in any way in this case. The judgment is affirmed.

*Affirmed.*

ON REHEARING.

January 22, 1913.

PRENDERGAST, Judge.—Appellant urges that this court was in error in holding that the lower court did not err in overruling his motion for a continuance. We have considered this question again and find nothing to change our views. It was decided correctly in the original opinion.

Appellant also urges so earnestly, forcibly and vigorously that the court erred in not sustaining his complaint to the 12th subdivision of the court's charge, that we have concluded to discuss this question further.

His complaint to this paragraph of the court's charge is contained in the 11th ground of his motion for new trial and we quote it in full: "Eleventh: The court committed an error in paragraph 12 of his charge to the jury in this, in applying the law to the facts of the case on murder in the second degree, the court authorized the jury to convict the defendant of murder in the second degree if they found and believed from the evidence that the defendant struck Tom Crutchfield with a gun and said gun in the manner in which it was used was likely to produce death or even serious bodily injury, and that said striking was in a transport of passion, and said stroke killed the deceased thereby eliminating malice, and the fact of an unlawful killing, and also the intention to kill, and authorizing a conviction

of murder in the second degree if the instrument used was such an instrument as would inflict serious bodily injury; and further said paragraph also authorized a conviction of the defendant irrespective of the time, and the place of the commission of said offense.''

The 12th subdivision of the court's charge is quoted in full in the original opinion. It is unnecessary to quote it here again. Appellant's points now against this charge are that that specific submission of the charge did not require the court to find that the killing was unlawful and that it was intentional. And to that feature of the court's charge which submitted to them the character of the instrument with which the fatal wound was inflicted, as one only reasonably calculated to produce serious bodily injury.

In discussing these question we may restate some of the general propositions laid down in the original opinion, but if so, it is for the purpose of making clear our decision.

Judge White in his Annotated Procedure states, and cites the cases therefor, certain principals with reference to the correctness of a charge, thus: ''The charge must be framed and is to be considered with reference to the facts of the case.'' Again, ''the charge is tested with reference to the evidence adduced at the trial and its sufficiency is determined by the applicability to the evidence.'' Again, ''the charge of the court should be based upon and be pertinent to the evidence.'' Again, it is elementary and established by all the authorities, that it is not proper to point out and consider objections to a single paragraph, word, or sentence in a charge, but the whole of the charge on the subject must be considered together in passing upon any criticism of any portion thereof.

Again, the statute, Code Criminal Procedure, in articles 735 to 742, inclusive, lays down rules prescribing what the charge of the court shall be and what it shall not be. Then in article 743 prescribes: ''Whenever it appears by the record in any criminal action, upon appeal of the defendant, that any of the requirements of the eight preceding articles have been disregarded, the judgment shall not be reversed, unless the error appearing from the record was calculated to injure the rights of the defendant   *   *   *''

Bearing these rules and statutory enactments in mind, and the evidence adduced on the trial of this case, which, on these several points was substantially and practically fully stated in the original opinion, we take up and discuss the several objections of appellant to said charge.

The first is he claims that in said subdivision twelve of the court's charge, the jury are not required to find specifically that the killing was unlawful. In considering this question it is necessary to know what defense appellant had. We find, upon a careful consideration of the record, that his main defense was that he was not guilty and that he did not do the killing, and that someone else did the killing. The court, on this point, as said in the original opinion, specifically and

pointedly told the jury that if some one else other than appellant killed the deceased, to acquit appellant. No complaint is made of the submission of that question by the court. The jury by their finding specifically found that no one else did the killing, but that appellant did. The appellant did not claim in that court, or this, that the killing was done by him in self-defense or in defense of another, or of his property. No such defense has been intimated. Neither did he claim then nor does he claim now that the killing was accidentally done by him. If either of these questions had been contened for by him in the court below and there had been evidence to sustain them, without doubt, the court below would have submitted both or either issue to the jury for a finding, but as neither was set up and no evidence of either, the court did not, of course, submit the questions. It may be that the evidence raised the issue of manslaughter, but if it did the court fully submitted that question to the jury of which there is no complaint whatever and the jury found that issue against him. There is no claim in this court and there was none in the court below that the killing of the deceased was in any way justifiable. The killing of the deceased was unquestionably established. That it was by appellant is also unquestionably established and the jury so expressly found, as stated above, when the question was submitted to them. Then there being no question of justifiable homicide raised by the evidence, and as murder in the first degree was not found, necessarily the killing was an unlawful one. There was no getting away from this. It could not legally in any way have been gotten away from. Then we are driven to the conclusion, under article 743, above quoted, that no injury whatever has occurred to appellant because the court did not specifically, in section twelve of his charge, require the jury to believe that the killing was unlawful. But we do not rest our opinion solely upon this question. We think, taking the charge as a whole and even those sections of it, Nos. 10 and 11, the question of whether or not the killing was unlawful was actually submitted to the jury by the court, and the jury could not convict the appellant without finding that the killing was unlawful under the terms of the charge as a whole. We think it unnecessary to again point out the specific points in these charges of the court whereby the court in submitting them in substance and in fact required the jury to believe that the killing was an unlawful one before they could convict appellant.

In the well considered case of Puryear v. State, 56 Texas Crim. Rep., 231, this court fully discussed and decided this question. As was said in that case, so we say in this: "The jury were in terms told that in order to constitute murder in the second degree, malice must exist, and further, that implied malice was inferred, or such as the law imputes to the act and fact of an unlawful killing. * * * It is certain, if one kills another intentionally, under circumstances not amounting to murder in the first degree, or such as would reduce the

grade of offense to manslaughter, and same is not in self-defense, it is unlawful." Again, "* * * It is not believed that the mere omission in a particular paragraph to require the killing to be unlawful, or upon malice, would vitiate what would be otherwise a proper charge where the facts required to be found, both as a matter of law and as a matter of fact, would make the killing unlawful and stamp it inevitably as of the grade of murder in the second degree." This Puryear case has many times been cited and approved by this court.

What we have said about the charge in this case, as to requiring the jury to believe that the killing was unlawful, is equally applicable and just as appropriate to the other feature of the charge complained of, that while it did not, in the paragraph complained of require a specific finding that the appellant intended to kill the deceased, yet when the whole charge is considered it did in substance and in fact so require. Besides this, as said by Judge White in section 74 of his Annotated P. C., "A man is always presumed to intend that, which is the necessary, or even probable consequence of his acts, unless the contrary appears," citing McCoy v. State, 25 Texas, 42; Aiken v. State, 10 Texas Crim. App., 610; Lane v. State, 16 Texas Crim. App., 172; High v. State, 26 Texas Crim. App., 546; Wood v. State, 27 Texas Crim. App., 393; Hatton v. State, 31 Texas Crim. Rep., 586; Shaw v. State, 34 Texas Crim. Rep., 435.

Again, as he says in section 77: "If the weapon, or means used by the assailant, were calculated to effect the purpose of murder * * * or serious bodily injury, it is an absolute presumption of law that it was the intention of the assailant to effect the purpose indicated; and, the presumption is imperative upon the jury as well as courts, and when applicable must be given in charge to the jury," citing Kendall v. State, 8 Texas Crim. App., 569; King v. State, 13 Texas Crim. App., 277; Lane v. State, 16 Texas Crim. App., 172; Jones v. State, 17 Texas Crim. App., 603; Pierce v. State, 21 Texas Crim. App., 541; Cochran v. State, 28 Texas Crim. App., 442; Ward v. State, 30 Texas Crim. App., 687; Skaggs v. State, 31 Texas Crim. Rep., 563 and Hatton v. State, supra, and Shaw v. State, supra.

We are not discussing, and do not hold in this case, that it would not have been proper for the court in this subdivision 12 of his charge to have required the jury to believe that the killing was both unlawfully and intentionally done, pointedly in this paragraph. In our opinion it would probably have been better for the court to have embraced both of these matters in this paragraph of his charge. We are discussing the question of whether or not the omissions of these terms in paragraph 12, taken in connection with all the other charge of the court and the evidence of the case, was reversible error. Probably, if self-defense or accidental killing had been shown, or there had been any evidence tending to show either of these matters, or had the appellant testified, or had there been any other testimony showing or tending to show that he did not kill the deceased intentionally, then

a different question might have been raised. But as there was no such defense and no such testimony, it is our opinion even if it could be held that the charge as a whole did not specifically require the jury to find as a prerequisite to appellant's conviction that the killing was unlawfully and intentionally done, that such omissions, under the terms of said article 743, Code Criminal Procedure, show no such injury as would justify this court to reverse this case. For the same reasons it is our opinion that no injury whatever is shown to the appellant by the court in the charge complained of using the language "or serious bodily injury" in connection with the charge wherein he said, in speaking of the instrument with which the killing was done "was an instrument reasonably calculated to produce death or serious bodily injury." In our opinion none of the grounds of complaint of the charge of the court by appellant under the circumstances of this case could have materially injured appellant's rights.

Appellant has cited and relies upon several decisions of this court wherein this court has held in those cases that the omissions complained of in the charge of the court above discussed were reversible error, but in our opinion each of those cases so held, because therein the question of an unlawful and an intentional killing was expressly raised by the evidence and defenses specifically set up therein and we think they are clearly distinguishable from this case. For the first time the question is suggested, appellant, in his motion for rehearing herein, attaches the affidavits of two jurors which were sworn to before one of appellant's attorneys claiming that the jury fixed the penalty in this case by each juror setting down the number of years he thought appellant should be confined, adding them all up and dividing by twelve and in that way fixed the number of years appellant was to be confined. It is claimed that appellant did not find this out until some eight months after the trial in the court below and then by accidentally finding some figures on slips of paper in the jury room at that length of time after the verdict. These affidavits are made before appellant's attorney, as stated. This court, through Presiding Judge Davidson, in Maples v. State, 60 Texas Crim. Rep., 169, specifically held that such an affidavit could not be considered even in the court below when made in time for that court to act thereon. That decision has been adhered to ever since by this court. Patterson v. State, 63 Texas Crim. Rep., 297, and cases cited. This court can not consider that matter as an original proposition here, even if it had been raised, or attempted to be raised in this court by a proper affidavit.

The motion for rehearing is overruled.

*Overruled.*