### JOHN MERKA v. THE STATE.

No. 4415.  Decided April 4, 1917.

Rehearing denied January 16, 1918.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence was sufficient to sustain the conviction on a proper charge of the court, there was no reversible error.

**2.—Same—Specific Intent to Kill—Charge of Court.**

Where, upon trial of murder, the court in his charge on said offense instructed the jury that they must find that the defendant had a specific intent to kill the deceased before they convict, there was no error in refusing a special charge on that question.

**3.—Same—Manslaughter—Charge of Court—Estoppel.**

Where, upon trial of murder and conviction thereof, the evidence did not raise the issue of manslaughter, there was no error in the court's failure to charge thereon; besides, the defendant estopped himself from such a charge by reason of his special charge on murder.

**4.—Same—Manslaughter—Definition—Charge of Court.**

To constitute manslaughter two things are absolutely necessary, first, sudden passion, and, second, that said passion must arise upon an adequate cause, and if either of these requisites are wanting an unlawful homicide can not be manslaughter.  Following Davis v. State, 70 Texas Crim. Rep., 37, and other cases.  And where the evidence excluded the theory of adequate cause, there was no error in the court's failure to charge on manslaughter.  Following Wilson v. State, 71 Texas Crim. Rep., 399; qualifying Johnson v. State, 42 Texas Crim. Rep., 377.

**5.—Same—Deadly Weapon—Rule Stated—Charge of Court.**

A charge is correct which informs the jury that a deadly weapon is one which, from the manner used, is calculated or likely to produce death or serious bodily injury, and where, as in the instant case, the homicide was committed by one stroke of an ax handle in the hands of the defendant, and the issue of fact was properly submitted by the court, there was no reversible error.  Following Prescott v. State, 54 Texas Crim. Rep., 485, and other cases.

**6.—Same—Intent to Kill—Charge of Court.**

The statute, article 1149, P. C., on the question of intent, being expressly submitted to the jury on the facts of the case, leaving it to them as a matter of fact, applying the reasonable doubt, and the evidence sustained the verdict of murder, there is no reversible error.

**7.—Same—Negligent Homicide—Requested Charge.**

Where, upon trial of murder, the evidence did not raise the issue of negligent homicide in the second degree, there was no error in the court's refusal to submit a requested charge thereon.

**8.—Same—Rule Stated—Negligent Homicide.**

Where the facts show an intentional blow without negligence, the issue of negligent homicide is not raised, as intentional killing is not negligent homicide. Following Thomason v. State, 2 Texas Crim. App., 550, and other cases.

**9.—Same—Aggravated Assault—Charge of Court.**

Where, upon trial of murder, the evidence may have raised the issue of aggravated assault, and it would have been proper for the court to have charged thereon, yet where the defendant did not object to the court's charge when it was submitted to him, and did not raise this issue until the State's attorney was about to conclude his final argument, there was not reversible error.

**10.—Same—Adequate Cause—Statutes Construed—Rehearing.**

The theory that the issue of manslaughter would exist without proof of adequate cause is erroneous, under articles 1147, 1148 and 1149, Penal Code, and is no doubt founded upon the decisions of this court in the cases of Johnson v. State, 42 Texas Crim. Rep., 377; Taylor v. State, 41 id., 148; Lee v. State, 44 id., 460; Betts v. State, 60 id., 635, and others, which are hereby qualified.

**11.—Same—Deadly Weapon—Aggravated Assault—Practice on Appeal.**

Upon trial of murder, where the evidence showed that the homicide was committed with one stroke of an ax handle, which was not per se a deadly weapon, it became a question of fact for the jury, whether from the manner in which it was used the intent to kill evidently appeared, and where the court's charge submitted article 1147, P. C., he should have charged also on aggravated assault; however, in the absence of a requested charge in due time, and a delay thereof until the argument was practically completed, its refusal is not available for review.

**12.—Same—Manslaughter—Obiter Dicta.**

The opinion in Johnson v. State, 42 Texas Crim. Rep., 377, and other cases, to the effect that if there was no intent to kill the court should submit the issue of aggravated assault or manslaughter is obiter dicta, and these decisions misconceive the purpose and effect of the statute. Following Hill v. State, 11 Texas Crim. App., 470.

**13.—Same—Intent to Kill—Sufficiency of the Evidence.**

Where, upon trial of murder and a conviction of such offense, the evidence showed that the manner in which the blow was struck with the ax handle, in connection with circumstances and the effect of the blow which crushed the skull of the deceased and killed him, this court is not justified in holding the evidence insufficient to sustain the finding of intent to kill, there is no reversible error.

**14.—Same—Stating Facts in Opinion.**

Where the mistake in stating the facts in the original opinion was immaterial as to the result, there was no reversible error.

Appeal from the District Court of Williamson. Tried below before the Hon. George Calhoun.

Appeal from a conviction of murder; penalty, twenty years imprisonment in the penitentiary.

The following is a statement of the testimony in the case:

That appellant killed deceased about 5 o'clock in the evening is shown by all of the testimony, and is in no way contested or disputed. Mrs. Jones testified that about 9 o'clock in the morning of this day

appellant called her over the phone at her home and asked if Mr. Jones was at home. "I told him no, he was in the field pulling corn." He says: 'Is he coming to town?' I said: 'He is coming this afternoon.' He says, 'I will see him when he comes.'" Mr. Jones did go to town that evening, taking a load of cotton seed.

Mr. F. W. Kettler, an eyewitness, testified: "I first met him (deceased) right in front of the First National Bank. I know Amos Peters, and I know where Mr. Peters' office is, up over the First National Bank building, upstairs. . . . I met Mr. Jones in front of that building. I had a conversation with Mr. Jones there in front of the bank, and while there with Mr. Jones I saw John Merka. I don't know where Merka was when I first saw him—he walked up to us while Mr. Jones and I were talking; he spoke to us, said, 'Howdy do,' and he says: 'I want to see you, Mr. Jones,' and Mr. Jones made the remark, . . . 'John, I will see you just a little bit later'; and Merka, he says, 'You go on now; I don't want to fool with you,' or something of that kind; . . . and that is about all that was said there . . . (here witness reiterates some of this), and Merka walked on down the street toward the railroad, south toward Zapalac's. As to giving the exact words used by Merka, will say I think Merka—that is, when he spoke to Mr. Jones, and as Mr. Jones told him, 'I will see you later,' I think he made the remark, 'No, damn it, I want to see you right now.'" Mr. Kettler further testified that when Merka then left them he went with Mr. Jones to Mr. Peters' office and stayed there with him until.the three of them, Mr. Peters, Mr. Jones, and he (Mr. Kettler), walked down the stairway onto the sidewalk at the bank. That when the three thus together reached the sidewalk, he, Mr. Kettler, stopped there and went on no further with Peters and Jones. He said: "When they left me Mr. Peters and Mr. Jones started off in a northeasterly direction toward the middle of Second Street. After Peters and Jones had started . . . I was looking in their direction, . . . John Merka passed me right there, and he called Mr. Jones—he passed me in front of the bank. As to where he was with reference to the sidewalk when he called to Mr. Jones, why, I think he was right near the sidewalk somewhere. He was going the same direction·Mr. Jones was going. Mr. Jones' back was towards John Merka when Merka called to him. Merka was walking tolerably peart; he was walking as fast as Mr. Jones—yes, I think he was walking faster. Jones was about half way across the street when Merka called to him—with reference to that wooden policeman, Mr. Jones was about even with that, only a little southeast of that. When Merka passed me·he had something in his hand. He had an ax handle. When Merka called to Mr. Jones, Mr. Jones turned around and looked at him and said—gentlemen, what he said I don't know, because I wasn't near enough to hear him. Jones then turned and kept on walking—he turned and said something to him; what, I don't know. Mr. Jones kept walking that same direction,

northeasterly. Mr. Peters was right at Mr. Jones when Mr. Jones turned. When Mr. Jones turned and continued walking, Merka kept walking that same direction, towards him—that is, in the same direction. . . . He caught up with him—Merka caught up with Jones, and he hit him with the ax handle. Jones' back was towards Merka when Merka struck him. I saw what Merka struck him with. He struck him with an ax handle. Merka, when he hit Jones, held the ax handle something like this (illustrating by holding ax handle raised and drawn back over right shoulder with both hands gripping ax handle). He held it in both hands." This ax handle with which appellant then killed deceased was produced and identified, and appellant admitted that "it was the ax handle with which he, defendant, Merka, struck the deceased, Jones."

All the eyewitnesses say that Merka struck Jones once only and that that lick felled him to the ground. Mr. Kettler further said that he stood only a second or two after the lick; then walked over to Jones, and he and others picked him up and carried him in said hardware store. He said: "After he struck Mr. Jones, Merka walked over on the curb right at the corner of Prewitt hardware." That Merka then walked into the hardware store, and he then had the ax handle. That when he reached Jones to pick him up, Jones was "just a little beyond the center of the street—oh, more than the center, because he was a whole lot nearer the Prewitt Hardware than the other way." Mr. Kettler further testified that there was nothing to obstruct his view between him and Merka and Jones. "I could see clearly everything that occurred. . . . When Merka struck him with the ax handle Jones was walking in that direction, he and Mr. Peters. He was not doing anything to Merka, not that I could see. I could see plainly." All of the above testimony of Mr. Kettler was given on direct examination by the State. His cross-examination developed no conflict but a mere reiteration.

On cross-examination he said: "When young Merka came up and had the talk with Mr. Jones that I have detailed, as to whether it is not true at that time that Mr. Jones seemed excited and appeared to be mad—well, it seemed like Mr. Jones was a little excited. I think I could observe that he was mad from his talk when he was talking with young Merka." Mr. Kettler pointed out on said plat about where Mr. Jones was when Merka called him as he and Peters were going to the office of the justice of the peace, and said: "It is almost midway between the two"—that is, between the wooden policeman and the corner of the Prewitt Hardware Store. He said: "Before Mr. Jones was hit (after Merka called him and he turned and replied something) I think he went about eight or ten yards further; I should say somewhere along about that. . . . At the time Mr. Jones was hit he was right near the corner of the Prewitt Hardware Company. . . . I suppose Mr. Jones was ten or fifteen feet—somewhere along there—

from this curb where you get on the sidewalk to go into Prewitt's Hardware. . . . Amos Peters was right there by the side of Mr. Jones, walking side by side."

On redirect examination Mr. Kettler said: "Merka was just off the sidewalk a little bit when he called to Mr. Jones. He was going in the direction of Jones when he called." (That was when Merka stepped off of the sidewalk at the bank following Peters and Jones.) On recross he said: "I saw him (Merka) step off before I heard him call."

Mr. Amos Peters, the assistant county attorney, testified that Mr. Jones was in his office twice in the evening before Merka killed him; that the first time it was about 3 o'clock in the afternoon, and then in about an hour and a half or two hours he returned the second time, and said witness Kettler was with him the second time. He said, "I think they must have been in my office about ten or fifteen minutes." That while they were in his office he had a conversation with Mr. Jones and after that the three, Kettler, Mr. Jones, and himself, left his office together "Mr. Jones and I, when we came down the stairs, started over to Judge Kellum's office." That after they came down the stairs and started up the sidewalk in front of the bank, going north, and went up almost to the edge of the sidewalk he and Jones started across the street, northeast; that Kettler did not follow and he didn't know which way Mr. Kettler went; that he was on the left side of Jones and close to him. "At the time I started across the street I had not seen John Merka, but while crossing the street I saw him. We got pretty near that dummy policeman there when I heard someone say something. I didn't know what was said, but I kinder looked back and saw a man coming across there with an ax handle in his hand. I didn't know who the fellow was at that time. He must have been four or five steps from me when I first saw him. I don't know what he said. He made some remark, but don't know what it was. I just judged he wanted to see Mr. Jones and paid no attention at all, and then I walked on—I kinder turned a little way from Mr. Jones, and I guess I must have been about three feet from Mr. Jones when I heard the crash and looked around and saw Jones hit the pavement. As to how far I had gone when I heard this man call until I heard Mr. Jones fall, will say, oh, nowhere—I guess a step or two. Jones, I guess, had gone about four feet from him when he was struck—I will say about four or five feet. I did not see Merka when he struck Jones. When I got to Jones I saw John Merka there. With reference to what John Merka did after Jones fell, well, when I heard the crash, I looked back and saw Mr. Jones—I just saw him hit the pavement. I walked back to him and looked at him and saw Mr. Merka standing right by the side of him looking at him with the ax handle in his hand. I left him standing there. Merka never said a word—just looked at Mr. Jones with the ax handle in his hand." He said he didn't recollect just how Merka held the ax handle, but he had it in his hand when

he looked back at Jones, and he didn't see what direction Merka then went.

On cross-examination he again at first reiterated that he didn't know, and couldn't say, just how Merka held the ax handle, but said: "Will say, to the best of my recollection, he had it in both hands. With reference to my stating that I did not know the way he was holding it— well, I won't say positively, but to the best of my recollection he had it in both hands."

Mr. Minor H. Brown, another eyewitness, testified that prior to the killing he was in front of Zapalac's store; that he then saw appellant coming in Zapalac's store. He said: "He had something in his hand; he had an ax handle. . . . When he came out of Zapalac's store with the ax handle, he went north towards the First National Bank entrance. I saw him after that. I saw him standing in front of the First National Bank. I could not say how long I noticed him standing there; I presume five or ten minutes.

"I saw him again after that; I saw him following the deceased across the street. . . . When I saw Mr. Jones he was going across the street from the First National Bank towards Prewitt's corner; Amos Peters was with him. Then I saw the defendant Merka. When I first noticed him with reference to Mr. Jones, Merka was standing in front of the bank; and when Mr. Jones left with Mr. Peters, he followed. As to whether I saw the lick struck, will say I saw the ax handle go up and saw it come down. When the lick was struck, Mr. Jones and Mr. Peters had crossed the street, possibly two-thirds of the distance or possibly three-fourths of the distance of the width of the street. I did not hear any words spoken before the lick was struck. . . . There was nothing between me and the man who did the striking to prevent me from seeing what occurred. . . . I could see the two men. . . . When I saw the lick struck, Mr. Jones fell. . . . I think I could see Merka all the time from the time he left the First National Bank corner until the time he struck Mr. Jones. I don't think he ever stopped walking from the time he left the First National Bank until he reached Mr. Jones and struck him. When I saw Mr. Merka come out of Zapalac's store, which is about here (indicating on the plat) about four doors south, and I saw Mr. Merka go to that corner and stay there (indicating First National Bank corner) and I was sitting here (Zapalac's), and when Mr. Jones started across the street, why, Merka followed him there. From the First National Bank Jones was going, I presume in a northeasterly direction."

It was shown substantially that the blocks in Taylor from street to street were 240 feet; that these blocks also had an alley in the center of them; that on the corner of the alley from the bank building was, first, a saloon; next, was Zapalac's store; then between Zapalac's and the bank building were four other stores, each about twenty feet wide;

that the bank building was fifty or seventy-five feet wide along Main Street.

Charley Stefka testified that he worked at Zapalac's. He knew John Merka. That on the day Merka killed Jones, before he killed him, Merka came into Zapalac's and said, "could he borrow an ax handle. He borrowed the ax handle," and then went out of the store, "and he said he would bring the ax handle back, but he didn't."

It was agreed by both sides and admitted before the jury "that the ax handle with which defendant, Merka, struck and killed W. G. Jones weighed twenty-four ounces, or a pound and a half.

Mr. C. F. Everett, another eyewitness, testified that he was out on the street at the time of the killing looking for some conveyance which he wanted to get to go to another part of the town. He seems to have been at or about the bank corner and said that Mr. Jones with Mr. Peters passed him; that he spoke to Mr. Jones, just said, "Howdy do, Mr. Jones"; that Mr. Jones and Peters were going about northeast. "He, Mr. Jones, passed me about, I suppose, seven or eight or ten feet to the north of where I was standing, when he stepped off of the sidewalk in front of the First National Bank building, and he was going in a direct position right towards—you might say on the other side of the walk they would pass the Prewitt hardware corner, about eight or ten feet north of the Prewitt hardware store. After they passed me I didn't continue to have my eyes in that direction. I paid no more attention. Nothing attracted my attention to Mr. Peters and Mr. Jones. I saw Mr. Jones when he was struck—I saw one man strike another but didn't know who it was. . . . I just happened to look in that direction when it happened. The man struck the other with an ax handle. . The man who struck with the ax handle when he struck held the ax handle in both hands. I did not hear anything said before I saw the blow struck." He said that where Jones fell it was "six or seven or eight or ten feet from the corner of the street, Second and Main Streets, about eight or ten feet straight in a northwest direction (from the corner at said hardware store). He then described the position of Mr. Jones when struck: "(Illustrating by slightly turning one shoulder to rear). And he was in a shape I would consider that he could see it. The man that was struck was walking along when he was struck." He then said that Merka used both hands in striking the blow. This witness was not cross-examined.

Mr. George Prewitt testified that he was standing in the door of the Prewitt hardware store at the time of the killing, but he did not see it. He said: "The first thing that attracted my attention, I heard a lick pass and looked around and saw somebody having trouble out there. When I looked around, the first thing I saw was a man lying on the ground—street." That he saw the defendant walk over towards the hardware store.

Mr. John Fotjik testified that he knew and saw appellant three different times in Taylor on the evening he killed Jones; that he first saw him at a drug store; that he next saw him at the Sturgis-Goldstein corner. It seems at this time he talked to him about him, Merka, hauling him back to Waterloo. "While talking to him at that time he didn't say anything about Mr. Jones. The next time when I talked to him, that was when he was talking to Mr. Jones, and he came off from Mr. Jones, and I asked him what was the matter, and he cried and he said he got trouble with Mr. Jones; he got trouble. At that time he did not have any ax handle or anything in his hand. Then I saw him later that day. Then I seen him standing at the First National Bank, right by the door. At that time he had an ax handle with him. I went to him and spoke to him, and he just pushed me off and said, 'Let me alone'; and I just walked off and didn't talk to him any more. With reference to what I said to him when I went to him at the bank when he had the ax handle, will say he told me when he walked off from Mr. Jones, he told me he had trouble; and when he had that ax handle he cry. I said: 'John, you had better let that trouble alone and get on.' He wouldn't talk to me; he just pushed me off and said, 'John, let me alone.' And then I walked off from him and didn't talk to him any more."

On cross-examination he testified: "I first saw John Merka that day at the Sturgis-Goldstein corner—not right on the corner; that was about 4:30 or 5 o'clock. I had been working over at Mr. Merka's gin, and I wanted to talk to John about the gin. I wanted to talk to him whether he can haul me to Waterloo. There was nothing said there about Mr. Jones not a word; as a matter of fact, he did not say anything about Mr. Jones any time at all, never mentioned Mr. Jones' name all that day even at the bank corner. I went to him to talk to him, and he cried and said: 'John, go away—go away and let me alone,' but did not say a word about Mr. Jones, did not mention anybody's name at all. . . ." He further reiterated that when he saw appellant at the Sturgis-Goldstein corner he talked to him about nothing except hauling him back to Waterloo. "Later I saw him standing on the bank corner with the ax handle, and I asked him about that, and he commenced to crying. He just said, 'John, you go away and let be alone,' but Jones' name was not mentioned at all."

On redirect examination he testified: "When he (appellant) walk off from Mr. Jones he cry, and I ask him, 'John, what's the matter?' and he said, 'I have trouble with Mr. Jones,' and said, 'Mr. Jones is to see me next time,' or something like that. That was before I saw him with the ax handle."

On recross-examination he testified: "I understand English, but not quite good." He then reiterated that he talked to appellant at two places, one at the Sturgis-Goldstein corner, when Mr. Jones' name was

not mentioned. He said: "I talked with him (appellant) one, two, three times. When he walked off from Mr. Jones, I asked him what was the matter, John. He said he had a little trouble with Mr. Jones, and told me something 'was going to see me,' or something like that, and he cry. That was before he had the ax handle. I know where Prewitt's hardware store is, and it was across from there, over here at the bank. He had been talking to Jones and left Jones and immediately after he left Jones and before he got the ax handle I spoke to him and he cried. He told me that Mr. Jones was going to see him. John Merka told me that and that is when he cried; immediately after he stepped off from me."

The testimony further shows that at once after deceased was picked up and carried into the store a doctor was summoned and Dr. Jones soon reached deceased. Dr. Jones then had the parties to take deceased up to his office and he at once called in Dr. Doak. They made a hurried examination of deceased and saw that he was seriously injured and at once had him carried to a sanitarium, which was equipped better than any of the doctors' offices, where they could make a thorough examination of him and perform whatever operation was necessary. Dr. Doak testified: "When I reached the sanitarium I made an extended examination of the injuries. Dr. Jones assisted me in making that examination. The injuries I found on Mr. Jones were, I found, the skull crushed; an area of about the size of a large egg. The bones were driven into the brain tissue; just caved in as if you would take an egg and knock it—broke the skull in. We removed the bone, dressed the wound, put the man in bed; he died an hour or two later. . . . I think we removed two pieces of bone from the head. It was broken in fragments—two or three pieces, now, if I recall, about the size of a half dollar. At the time I made the examination a portion of the brain exuded. Quite a bit of the brain tissue poured out of the wound." The doctor further testified as to the location of the wound on Mr. Jones' head, stating that it was "on the right side of the head, a little to the rear of the center—you call that the center (indicating a spot or line to the right and back of head). It would be a little behind the center line. There is a seam in the middle of the skull. There is one in that fissure there (indicating on the head). As to whether that would be an easy place for the skull to be crushed, well, there might be stronger places, but it is about the average skull." (The witness termed the location of the wound as the right parietal.) "As to whether a double bone here in the region of that is unusual, well, all the skull bones are grouped in two layers, and the brain is beneath them, the second layer. Both layers were crushed." Dr. Doak further testified that in his opinion the injury on Mr. Jones' head caused his death. "That wound could have been caused by striking one with an ax handle." When Dr. Doak was on the stand testifying to the extent of the wounds

and what caused deceased's death, appellant admitted "that the cause of the death of Mr. Jones was from the blow on his head."

*J. F. Taulbee, A. S. Fisher, H. C. Mantor, H. Zdaril,* and *A. S. Fisher, Jr.,* for appellant.—On question of court's failure to charge on manslaughter: Elliston v. State, 10 Texas Crim. App., 361; Runnels v. State, 42 Texas Crim. Rep., 555; House v. State, 75 Texas Crim. Rep., 338, 171 S. W. Rep., 206, and cases cited in the opinion.

*E. B. Hendricks,* Assistant Attorney General, for the State.—Citing cases in the opinion.

PRENDERGAST, JUDGE.—Appellant was convicted of the murder of W. G. Jones, and his punishment assessed at twenty years in the penitentiary. The facts of the case were established by clear, undisputed and unimpeached testimony.

Deceased was a man of small stature, fifty-four years old and weighed about 125 pounds. He lived with his family at Waterloo, about five and one-half miles north of Taylor. Appellant, as most of the witnesses designated him, was a young man. He was larger than Jones and lived at or near Taylor. One witness said he was about nineteen years old at the time of the trial, in January, 1917.

The day before appellant killed deceased he went to deceased's place. Mrs. Jones, deceased's widow, swore he was there and she saw him talking to her husband but did not hear what he was talking about. The next morning about 9 o'clock appellant called up Mrs. Jones over the phone at her home and asked her if deceased was there. She told him he was not but was in the field pulling corn. He asked: "Is he coming to town?" She replied: "He is coming this afternoon." Appellant said: "I will see him when he comes." Deceased did go to Taylor that evening with a load of cotton seed, reaching there about 3 o'clock in the afternoon of October 28th. About that time he went to see the assistant county attorney in his office. About an hour and a half thereafter he returned to this attorney's office and remained there with the attorney and another witness, Mr. Kettler, about ten or fifteen minutes, and had a conversation with the attorney. He and the attorney with Mr. Kettler then left the attorney's office, which was upstairs over the First National Bank, to go to the office of the justice of the peace, diagonally across two streets in another block, perhaps a little more than a half block distant from the attorney's office. While Mr. Kettler came downstairs with them he stopped on the sidewalk near the corner at said bank.

Just before deceased and Mr. Kettler went up to the attorney's office the second time, deceased and Mr. Kettler were talking on the sidewalk at said bank corner. Appellant came up and spoke to them saying, "Howdy do." He then said, "I want to see you, Mr. Jones." Jones

replied, "I will see you a little bit later." Appellant said, "No, damn it, I want to see you right now." Jones said, "You go on now; I don't want to fool with you." Appellant then walked away from them, and Jones and Kettler at once went up in the attorney's office.

Appellant walked down the street about a half block to a store, went in and borrowed an ax handle, which weighed just one pound and a half. He then returned to the bank corner with the ax handle and waited around there, without doubt waiting for Mr. Jones to return to the street from the attorney's office. Just after what was said between appellant and Jones just above related and before appellant got the ax handle, Mr. John Fojtik, an acquaintance of appellant, approached him, spoke to him and asked him what was the matter. He cried and said: "He got trouble with Mr. Jones; he got trouble. Mr. Jones is to see me next time." A short time before this Mr. Fojtik saw him across the street from the bank and had some conversation then with him about getting him to take him, the witness, out to Waterloo. At that time appellant said nothing about Mr. Jones. When appellant returned to said bank corner with the ax handle, Mr. Fojtik went to him and spoke to him again and said to him, "You had better let that trouble alone and get on." But appellant commenced crying and just said, "John, you go away and let me alone." And the witness walked off from him and had no more talk with him.

When deceased and the attorney left the office of the latter together, going to that of the justice of the peace, they stepped off of the sidewalk at the bank corner and walked side by side until they got about half way across one street. Appellant with his ax handle then stepped off of the sidewalk at the bank corner, following Mr. Jones. After getting a few steps he called to Mr. Jones. Mr. Jones partially turned without stopping and said something. No witness could tell what he said. He and the attorney continued going. Appellant continued after Mr. Jones rapidly. Mr. Jones and the attorney proceeded some steps further, without either of them looking back or knowing that appellant was approaching. When he got close enough to Mr. Jones, he raised the ax handle with both hands and overhanded struck Mr. Jones on the right side of his head, to the rear of about the center of his head, an awful blow, which felled Mr. Jones on the street. The attorney said that the crash of the blow attracted his attention, and he turned and saw Jones as he fell upon the ground, though he did not see the blow struck. After striking Jones this blow and felling him to the ground, one witness said that appellant still held the ax handle in both hands, and gazed at Jones on the ground for a short time. Doubtless seeing he had accomplished his intention of killing him, struck no more but walked away. Eyewitnesses, who saw and testified to all this, at once went to, and picked Mr. Jones' body up and carried it into one of the stores. Mr. Jones never spoke after appellant struck him. A

doctor was immediately summoned and at once had the body removed to his office, where a hurried examination was made, and ascertaining that the wound was a very serious one, had him taken to the sanitarium, where a thorough examination was made of deceased's skull. The doctors testified that they found his skull crushed in by the blow an area about the size of a large egg. The bones were driven into the brain tissue. That the skull was broken in as if you would take an egg and knock it. The doctors dressed the wound, removing therefrom two or three pieces of the broken skull about the size of a half dollar. When they first made this thorough examination, and before these bones were removed, a considerable portion of deceased's brains poured out of the wound. The doctor further testified that while there might be stronger places of the skull than where this blow was struck, it was about the average of the skull; that the skull bones at this point were in two layers; the brain was beneath the second; that this blow crushed both layers. Appellant did not testify at all. When the doctor was testifying that the blow with an ax handle would cause the crushing of deceased skull and his death, appellant admitted that that was the cause of his death. Mr. Jones died a few hours after appellant struck him and crushed his skull.

The court gave a full and apt charge submitting murder alone. He correctly stated the case and told the jury what the offense of murder was in accordance with the statute. He correctly and fully defined malice aforethought.

The appellant complained of the court's refusal to give his special charge, as follows: "That before you can convict the defendant in this case you must find from the evidence and beyond a reasonable doubt that at the time the defendant struck the deceased, if he did strike him, with an ax handle that the defendant had the specific intent to kill deceased, and if you have a reasonable doubt about the intention of the defendant, you must acquit him." The judge at the time refused this charge, stating that it was covered by the general charge of the court.

The court in his main charge in one paragraph instructed the jury: "To warrant a conviction for murder, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the defendant, in the commission of the homicide, was actuated by malice aforethought, and with *specific intent to kill.*"

In two other paragraphs he instructed them: "What is meant by deadly weapon, whenever used in this charge, is meant a weapon which from the manner used is calculated or likely to produce death or serious bodily injury.

"The instrument or means by which a homicide is committed are to be taken into consideration in judging the intent of the party offending. If the instrument be one not likely to produce death, it is not to be

presumed that death was designed, unless from the manner in which it was used, such intention evidently appears."

Then, in the next paragraph, submitting the case to the jury for a finding, he instructed: "Bearing in mind all the instructions given you, if you believe from the evidence in this case beyond a reasonable doubt that the defendant, John Merka, in the County of Williamson, State of Texas, on or about the 28th day of October, A. D. 1915, did then and there unlawfully and with malice aforethought *and with intent to kill,* and with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, strike one W. G. Jones on the head with an ax handle and thereby killed the said W. G. Jones, as charged in the indictment, you will find the defendant guilty of murder as charged and assess his punishment at death, or by confinement in the penitentiary for life or for any term of years not less than five, as the jury may determine and state in their verdict. And unless the jury so find from the evidence the facts to be beyond a reasonable doubt, then they will acquit the defendant and say by their verdict 'not guilty.' "

In addition, in a separate paragraph, the court told the jury: "In all criminal cases the burden of proof is on the State. The defendant is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt; and in case you have a reasonable doubt as to the defendant's guilt you will acquit him, and say by your verdict 'not guilty.' "

Undoubtedly the court's charge fully covered appellant's special charge, and the judge correctly refused to give it. Appellant objected to the court's charge because he did not submit the question of manslaughter, claiming that the evidence raised that issue, and asked a charge on that subject. The court refused to charge on that subject on the ground, expressly stated by him, that the evidence did not raise the issue. The judge's action was correct. The evidence did not raise manslaughter.

Even if manslaughter could have been raised by the mere fact that the ax handle might not have been a deadly weapon per se, and that appellant might not have intended to kill the deceased when he struck the fatal blow, yet he cut himself off from a submission of that issue by specially requesting his special charge above copied. Doubtless the court, because of that special charge and appellant's contention therefor, instructed the jury as he did as copied above, "To warrant a conviction for murder, the jury must be satisfied from the evidence beyond a reasonable doubt that the defendant . . . was actuated by malice aforethought, *and with specific intent to kill";* and required the jury to believe beyond a reasonable doubt that at the time he struck him he did so *with intent to kill,* before they could convict him of murder; "and unless the jury so find from the evidence the facts to be beyond a

reasonable doubt, then they will acquit the defendant and say by their verdict 'not guilty.'" To have then told the jury that if he did not intend to kill to find him guilty of manslaughter, would have been in direct conflict with his charge telling them if he did not intend to kill "you must acquit him."

Our statute (art. 1128 et seq.) on manslaughter is clearly and fully to the effect, as has many, many times been held by this court, that to constitute manslaughter two things are absolutely necessary: first, sudden passion; and, second, that that passion must arise from an adequate cause. If either of these requisites are wanting, an unlawful homicide can not be manslaughter.

In Davis v. State, 70 Texas Crim. Rep., 37, this court, through Judge Davidson, said: "It may be laid down as an uncontroverted proposition that two things are requisite to constitute manslaughter: first, adequate cause; second, existing passion. If these co-exist, the homicide is manslaughter. If they do not combine to co-exist, it may be murder in one of the degrees."

In Redman v. State, 67 Texas Crim. Rep., 374, this court said: "The statute itself defining manslaughter has two requisites to reduce voluntary homicide to manslaughter, towit: sudden passion, and that that passion must arise from an adequate cause. If either of these requisites are lacking, the offense can not be manslaughter but must be murder in one or the other degrees."

In McKinney v. State, 8 Texas Crim. App., 626, this court, through Presiding Judge White, said: "A killing upon such sudden passion as is mentioned may be murder in the second degree, even though the passion was anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection. To make such killing manslaughter, there must actually have existed not only such state or emotion of the mind, but the *adequate cause* which produced them must also exist. Penal Code, art. 1137. Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, may be sufficient to cause the emotions of the mind known as anger, rage, sudden resentment, or terror, to the extent even of rendering it incapable of cool reflection, and yet a killing under such circumstances would not be manslaughter. Why? Because such insulting words or gestures, or such assault and battery, *are not adequate causes* (P. C., art. 1131), and manslaughter can not be predicated upon any voluntary homicide upon sudden passion not arising from an *adequate cause*. (P. C., art. 1128.)"

To precisely the same effect as these cases quoted from is the very recent case of Marshbanks v. State, 192 S. W. Rep., 247. And also Wilson v. State, 71 Texas Crim. Rep., 403; Kelly v. State, 68 Texas Crim. Rep., 317, 151 S. W. Rep., 304; Clore v. State, 26 Texas Crim. App., 24; Hill v. State, 11 Texas Crim. App., 456; Neyland v. State,

13 Texas Crim. App., 536; Blackwell v. State, 29 Texas Crim. App., 194; Miller v. State, 31 Texas Crim. Rep., 609; Ex parte Jones, 31 Texas Crim. Rep., 422, and a great many other cases.

The testimony herein not only shows no adequate cause, but it excludes any such idea. · It also not only fails to show any sudden passion of appellant aroused by any adequate cause, but it affirmatively shows, and authorized the jury to find and believe, that appellant bore malice against deceased, and for that reason slew him, and the jury so believed and found. The evidence would not have authorized the jury to believe that any passion of appellant against deceased, even if it was sufficient to show any at all other than malice, was caused by what occurred at the time he killed deceased or that day prior thereto. sought, and had an interview with, deceased at the time. What then It shows that appellant went to deceased's place the day before and occurred and was said the State could not prove. Appellant had the right to refuse to testify and tell anything about it. He had killed the deceased, so that deceased could not tell it. No one was present at the time. Deceased's widow did not hear what was said and could testify only, as she did, that appellant talked to the deceased at the time. It further shows that he again sought the deceased the next morning, calling for him at his residence over the phone, and when Mrs. Jones told him that he was in the field pulling corn, he asked if he was coming to town. She told him he was that evening, and then he said that he would see him at that time, and he did. He told Mr. Fojtik just a few minutes before he killed the deceased that he had trouble with Mr. Jones and that Mr. Jones would see him the next time. He thereupon armed himself with an ax handle. This handle was produced, identified, and introduced in evidence. The jury saw and must have handled it. They, therefore, from it and the other testimony, could tell with certainty, as used and the effect it had, that it was a deadly weapon. (Crutchfield v. State, 68 Texas Crim. Rep., 468; Luttrell v. State, 70 Texas Crim. Rep., 183.) From all the facts and circumstances the jury were clearly justified in believing it was a most deadly weapon. As used it killed deceased. As soon as he procured it he returned to where he knew Mr. Jones would necessarily return shortly. He laid in wait there for him. When Mr. Jones did return where he must have seen him he did not then approach him to his face and say or do anything to him, but he waited till Mr. Jones got some distance from him with his back to him. Then he stealthily slipped up behind him, and without any notice to him, and without Mr. Jones knowing his danger, assassinated him by striking him a most powerful blow on the back of his head, crushing his skull and felling him like a beast to the ground, from which, in a few hours, he died. These facts all show, and authorized the jury to believe, as they did, that appellant bore malice against Mr. Jones, and caused by this malice aforethought

he stealthily slipped upon him from behind and struck him such a blow on the skull with such an instrument as to crush his skull and thereby unquestionably show that his intention was to kill him as he did.

Appellant relies upon Johnson v. State, 42 Texas Crim. Rep., 377, as in point on the question of manslaughter. Some expressions of Judge Henderson in the opinion in that case if taken alone might be construed as tending to show that from the mere fact that the instrument used might not be a deadly weapon *per se* that that would raise the issue of manslaughter, but when rightly considered in connection with the whole opinion and all the facts of that case, that fact alone was not held to raise manslaughter, but that it should be considered by the jury in determining whether or not appellant intended to kill the deceased. Judge Henderson in that case says that the stick used in that instance was not a weapon ordinarily calculated to produce death. "At least this fact should have been presented to the jury, so that they might pass upon it." That was done in this case fully and completely by the charge of the court. He expressly told them what was meant by a deadly weapon in clear language and just such language as has all the time been approved as correct by this court. (2 Branch's Ann. P. C., p. 935.) From the decisions of this court Mr. Branch correctly says: "A charge is correct which informs the jury that a deadly weapon is one which from the manner used is calculated or likely to produce death or serious bodily injury. Kouns v. State, 3 Texas Crim. App., 13; McReynolds v. State, 4 Texas Crim. App., 328; Hardy v. State, 36 Texas Crim. Rep., 400; Wilson v. State, 37 Texas Crim. Rep., 159; Henry v. State, 54 S. W. Rep., 592; Tollett v. State, 55 S. W. Rep., 335; Leal v. State, 46 Texas Crim. Rep., 336; Prescott v. State, 54 Texas Crim. Rep., 485; Harris v. State, 72 Texas Crim. Rep., 491, 162 S. W. Rep., 1150." Judge Henderson further said in said Johnson case that the issue therein for the jury was whether the circumstances showed appellant evidently intended to take the life of the deceased by the blow given; and if he did so, then he might be guilty of murder or manslaughter "according to the *other* facts of the case." In that case it does not appear that the court told the jury what would be a deadly weapon as the court did in this case. Doubtless "the other facts" in that case might have raised manslaughter, but in this case they did not.

Now further as to the question of whether or not the evidence in this case was sufficient to show and authorize the jury to find as they did that appellant *intended* to kill the deceased. The question of intent, as held by Judge Hurt in Fitch v. State, 37 Texas Crim. Rep., 500, and other cases where the instrument used in the killing might not be a deadly weapon *per se,* is a fact to be found by the jury from all the evidence and is not a matter of law alone. In this case, as shown, this question of fact was expressly left to the jury for its finding

from all of the testimony. The court did not charge as a matter of law that appellant's intent was to kill, but left that question to the jury for it to find and determine as a fact. Now, how is this intent to be shown? As stated, appellant did not testify himself that he had no such intent. He had the right to testify and he had the right to decline. He declined. Therefore, the question of intent must be ascertained from all the facts and circumstances.

Judge White in his Annotated Penal Code, section 74, says: "A man is always presumed to intend that which is the necessary, or even probable consequence of his acts, unless the contrary appears. McCoy v. State, 25 Texas, 42; Aiken v. State, 10 Texas Crim. App., 610; Lane v. State, 16 Texas Crim. App., 172; High v. State, 26 Texas Crim. App., 546; Wood v. State, 27 Texas Crim. App., 393; Hatton v. State, 31 Texas Crim. Rep., 586; Shaw v. State, 34 Texas Crim. Rep., 435." Our statute (art. 1149, P. C.) in homicide cases expressly states in effect when and how the intent of an accused when he has killed another may be found, stating that where a homicide occurs even under the influence of sudden passion but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide unless it appear that there was an intention to kill. This statute was expressly given to the jury by the judge in his charge, and as stated, the question of what appellant's intent was at the time when he struck the fatal blow was to be found as a matter of fact by the jury, and they were told that they must believe beyond a reasonable doubt that at the time he struck the blow he did so with the specific intent to kill, and unless the jury found beyond a reasonable doubt from the evidence that that was his specific intent at the time that they not only could not convict him of murder but they must find him not guilty. There can be no question but from the charge in this case the jury had to find and believe beyond a reasonable doubt that it was appellant's intention to kill the deceased at the time he struck the blow, and unless they did they had to acquit him. The evidence was amply sufficient for the jury to believe that that was his intent, and they so found.

Another contention by appellant is that the court refused to submit the issue of negligent homicide in the second degree. And he asked a charge on that subject which the court refused to give, stating thereon at the time that the evidence did not raise the issue of negligent homicide. The court's action was right. The evidence did not raise the issue of negligent homicide. A case might well be supposed where negligent homicide would arise. Thus, in this case if there had been any testimony, for instance, that appellant merely intended to give the deceased a beating with the ax handle and that as he attempted to strike him therewith on some other portion of his body other than his skull the deceased dodged or stumbled or he himself stumbled and he accidentally struck him on the head when he intended to strike him else-

where on the body which would not have proved fatal, then negligent homicide might have been in the case, but there is no such state of fact, and none such could be inferred from the evidence. The evidence from no viewpoint would have authorized or justified the court to have submitted a charge on negligent homicide either from the statutes on the subject or any decision thereunder. Mr. Branch, in 2 Branch's Annotated Penal Code, section 1990, truly states the law thus: "The facts showing an intentional blow without negligence, the issue of negligent homicide is not raised; on the contrary, if the defendant did not intend to kill but intended to beat the deceased with a stick, a weapon not necessarily deadly but calculated to inflict and which did inflict serious bodily injury, the issue of aggravated assault but not of negligent homicide is raised." He further says: "An intentional killing is not negligent homicide. Thompson v. State, 2 Texas Crim. App., 558; Dwyer v. State, 12 Texas Crim. App., 540; Tomerlin v. State, 26 S. W. Rep., 66; Flynn v. State, 43 Texas Crim. Rep., 407." Again he says: "The court need not charge on negligent homicide in the absence of facts showing no apparent intention to kill. Aiken v. State, 10 Texas Crim. App., 617; Houston v. State, 34 Texas Crim. Rep., 588; Clifton v. State, 47 Texas Crim. Rep., 478."

The evidence may have raised, and it may have been proper ror the court to have charged on aggravated assault, but the record conclusively shows that the court under the statute, after the evidence was closed and before the argument was begun submitted his charge to the appellant and his attorneys for their action thereon. They did not then make any objection whatever to the court's charge because he had failed or omitted to charge on aggravated assault. Neither did they at the time request any special charge on that subject. However, after the charge of the court had been read to the jury and the argument of all the attorneys concluded except when the district attorney, who made the final argument for the State, was about concluding his argument, the appellant's attorneys for the first time then asked a special charge on aggravated assault. The court refused to give it at that time, stating the facts above as the reason therefor. His action was strictly in compliance with the statute which forbade him to give a charge at that stage of the case. (Art. 737a, C. C. P., as added by the Act of April 5, 1913, p. 278.)

The judgment is affirmed.

*Affirmed.*

ON REHEARING.

January 16, 1918.

MORROW, JUDGE.—The appellant was a youth about nineteen years of age, not fully grown. Deceased was a man about fifty-four years of age, weighing about 125 ponuds. On the morning of the day of the homicide appellant talked over the telephone to the wife of deceased.

Inquiring if deceased was at home and learning that he was, asked whether he was coming to town, and on being informed that he would that afternoon, said, "I will see him when he comes." This occurred about 9 o'clock in the morning. On the day prior to this conversation the father of appellant had been to the deceased's home and had a conversation with him. During the afternoon, while the deceased and a witness were in conversation on the street, appellant approached, and after saying "Howdy do" to the deceased said, "I want to see you, Mr. Jones," to which deceased replied, "I will see you a little bit later." Appellant said, "I want to see you right now." Deceased replied, "You go on now, I don't want to fool with you." Appellant walked away and the witness and the deceased walked upstairs to the office of Mr. Peters, assistant county attorney. The three, the witness, Jones, the deceased, and Peters, shortly afterward walked down the stairway together, Peters and deceased starting to walk across the street. The appellant, who, in the meantime, had borrowed an ax handle, approached them and called to the deceased, and when called, the deceased, who had his back to appellant, turned around and spoke to appellant and after doing so walked on, appellant following him, striking him one blow with the ax handle, holding it in both hands when he struck. The deceased fell, was taken to a sanitarium, and shortly thereafter died.

A witness testified that shortly before the homicide, during the afternoon, he had met the appellant and had a conversation with him in which nothing was said about the deceased; that afterward the witness saw him talking with deceased and thereafter he met appellant again and he cried and said he had trouble with Mr. Jones, the deceased. At that time he did not have an ax handle, but the witness later saw him with an ax handle, crying, and said to him, "John, you had better let that trouble alone and go on." Appellant would not talk, pushed him away and said, "Let me alone." There was evidence by the attending physician that the blow crushed the skull of deceased; that the bones were driven into the brain tissues on an area about as large as an egg; that two pieces of bone about the size of a half dollar which were broken into fragments were removed from the head and as a result of the blow a part of the brain exuded or poured out of the wound.

This is a substantial statement of the facts. I do not find in it any evidence of express malice. The cause of the difficulty or trouble between the appellant and Jones is not disclosed. The facts, I think, are sufficient on the question of manslaughter to raise an issue as to whether his mind was in a condition for cool reflection, but there is an absence of testimony of the other essential element to reduce the homicide to manslaughter, namely, evidence of adequate cause. The appellant's theory in the trial of the case was to the effect that the issue of manslaughter would exist without proof of adequate cause. This idea was founded upon decisions of this court in the Johnson case, 42 Texas Crim. Rep., 377; Betts v. State, 60 Texas Crim. Rep., 631; Lee v. State,

44 Texas Crim. Rep., 460; Taylor v. State, 41 Texas Crim. Rep., 151. These cases construe articles of the Code relating to a homicide taking place by the use of a weapon other than deadly weapon. Article 1147 is as follows: "The instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending; if the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless, from the manner in which it was used, such intention evidently appeared." Article 1148 is as follows: "If any injury be inflicted in a cruel manner, though with an instrument not likely under ordinary circumstances to produce death, the killing will be manslaughter or murder, according to the facts of the case." Article 1149 is as follows: "Where a homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide, unless it appear that there was an intention to kill, but the party from whose act the death resulted may be prosecuted for and convicted of any grade of assault and battery."

The ax handle was not *per se* a deadly weapon. Branch's Ann. P. C., sec. 2002, and cases cited. It, therefore, became a question of fact for the jury as to whether from the manner in which the ax handle was used, the intention to kill evidently appeared. Branch's Ann. P. C., p. 1180. The court gave the substance of this statute, article 1147, in charge to the jury. He submitted no issue except that of murder. Under the facts of the case the instrument not being *per se* a deadly weapon and the question of the evident intent to kill, in the manner of its use, being one of fact, the charge to have been complete in submitting the law should have charged on aggravated assault. See Hill v. State, 11 Texas Crim. App.; 470, and numerous cases following it listed in Branch's Ann. P. C., p. 1182. In other words, the jury should have been informed of what offense appellant would have been guilty in the absence of an intent to kill. Beaupre v. State, 70 Texas Crim. Rep., 19, 156 S. W. Rep., 625.

This being an omission in the charge, however, is not subject to review in the absence of an exception or proffered special charge at the time of the trial, and the special charge on aggravated assault which was requested by appellant not having been requested until argument was practically completed its refusal is not available for review.

In Johnson's case, 42 Texas Crim. Rep., 377, Judge Henderson, delivering the opinion of this court, used the following language: "We believe, under our statutes, in every case where it becomes a question whether or not there was an intention to kill on the part of the slayer suggested by the character of weapon used not being deadly, that it is the duty of the court to submit the issue of manslaughter; and, furthermore, if there was no intention to kill, he should submit the issue of aggravated assault. See Fitch v. State, 37 Texas Crim. Rep., 500; Taylor v. State (Texas Crim. App.), 51 S. W. Rep., 1106; Dones v.

State, 8 Texas Crim. App., 112; Whitaker v. State, 12 Texas Crim. App., 436." This not seem to have been necessary in deciding the case.

A similar construction of the statute is given in Taylor v. State, 41 Texas Crim. Rep., 148; Lee v. State, 44 Texas Crim. Rep., 460; Betts v. State, 60 Texas Chim. Rep., 635.

We believe that in so far as these decisions that lay down the proposition that the statutes quoted above require the submission of manslaughter without proof of adequate cause where the instrument used is not *per se* a deadly weapon, that they misconceive the purpose and effect of the statute. This is the view of Mr. Branch° as stated in his Annotated Penal Code, page 1183. This is in accord with the opinion of this court written by Judge Hurt in the Hill case, 11 Texas Crim. App., 470.

Relying upon this interpretation in the published opinions of this court in Johnson v. State, supra, and the other cases mentioned in that connection, appellant's counsel regarded the evidence such as to require the trial court to submit the charge of manslaughter and excepted to its failure to do so. The exception was general, however, its terms being, in substance, such as were held insufficient in the cases cited in Branch's Ann. P. C., p. 1131, sec. 2004. The trial court guided by the opinion of this court in Hill v. State, supra, and its own interpretation of the statute held, we think, correctly, that the issue of manslaughter was not raised.

The manner in which the blow was struck with the ax handle, in connection with the circumstances, and the effect of the blow in crushing the bones of the skull of deceased was such that we would not be justified in holding the evidence insufficient to sustain the finding of intent to kill.

I therefore believe that the motion for rehearing should be overruled.

*Overruled.*

PRENDERGAST, JUDGE (concurring).—I concur in overruling the motion. In the original opinion by mistake I stated it was appellant who called on deceased at his home the day before he killed him. It was not appellant, but his father. This mistake was in no way material against appellant.