ERNEST PINSON v. THE STATE.

No. 7442.    Decided February 7, 1923.

Rehearing Denied June 6, 1923.

### 1.—Murder—Manslaughter—Charge of Court—Article 743.

If the issue of manslaughter was properly in the instant case ,the charge of the court which instructed the jury that if defendant struck the deceased, with a chair, a deadly weapon, intending to kill her, and did thereby kill her, he would be guilty of murder, would have been erroneous, but the facts in the case not raising the issue of manslaughter, there was no reversible error in submitting this charge, under Article 743, C. C. P., as it was not productive of harm to the rights of the accused.

### 2.—Same—Evidence—Expert Opinion.

Where, upon trial of murder the physician qualified himself an an expert witness, there was no error in permitting him to testify that from his examination of the wounds or discolorations found by him on the body of the deceased the same could have been made by the chair which was in evidence, there was no reversible error. Following Tolston v. State, 225 S. W. Rep., 1098.

3.—Same—Evidence—Res Gestae.

Upon trial of murder there was no error to introduce in evidence the conduct of the defendant toward the son of the deceased preceding and immediately following the assault upon her.   This was *res gestae*.

4.—Same—Rehearing—Manslaughter—Charge of Court.

Where appellant insisted on a motion of rehearing that because the killing was by a blow from the chair, a weapon not *per se* deadly, that manslaughter was necessarily in the case, and that therefore the court's charge was erroneous, but the record showed that the court below gave to the defendant the full benefit of Article 1150, C. C. P., and that if he without intention to kill struck her with a chair, they could only convict him of aggravated assault, and besides, the facts did not raise the issue of manslaughter, there is no reversible error.

Appeal from the District Court of Shelby.   Tried below before the Honorable Chas. A. Brachfield.

Appeal from a conviction of murder; penalty, twenty-five years in the penitentiary.

The opinion states the case.

*Woolworth & Duran,* for appellant.—Upon question of manslaughter, Liskosski v. State, 3 S. W. Rep., 696; Johnson v. State, 60 id., 48; Fitch v. State, 37 Tex. Crim. Rep., 500; Grant v. State, 143 S. W. Rep., 929.

*R. G. Storey,* Assistant Attorney General, for the State.

LATTIMORE, Judge.—Appellant was convicted in the District Court of Shelby County of murder, and his punishment fixed at twenty-five years in the penitentiary.

The trial court submitted the issue of murder, manslaughter and aggravated assault and gave an instruction that the jury should find appellant not guilty if they found from the evidence, or had a reasonable doubt thereof, that death resulted from any other agency than that of the injury inflicted by appellant.

In applying the law to the facts the court in paragraph 8 of the charge gave the following:

"Now, if you believe from the evidence beyond a reasonable doubt that the defendant, in the County of Panola, State of Texas, at or about the time stated in the indictment struck with a chair and thereby killed the deceased, and you find from the evidence that the chair was a deadly weapon, as hereinbefore defined, and that the defendant, when he struck the deceased, if he did so strike her, did so with the intention of killing the deceased, you will find the defendant guilty of murder and assess his punishment by death or by confinement in the State penitentiary for life or for any term of years not less than five.   If you do not so believe, or if you have a reasonable doubt of any of the above facts, you will find him not guilty of murder,

and further consider whether the defendant is guilty of manslaughter or an aggravated assault.''

If the issue of manslaughter was properly in this case on its facts, the above charge was clearly erroneous in that it told the jury that if appellant struck the deceased with a chair, a deadly weapon, intending to kill her, and did thereby kill her, he would be guilty of murder; and that only in case the jury did not so believe, or they found themselves without reasonable doubt as to such facts, could they even considere the question of appellant's guilt of manslaughter.

Manslaughter is an intentional killing differentiated from murder only by the mental status of the accused, and the jury might in a proper case, if allowed so to do under the charge of the court, consider the question and find the defendant guilty of manslaughter, even though they believed beyond a reasonable doubt that he had intentionally killed the deceased with a deadly weapon. If then this case called for a charge on manslaughter, it would have to be reversed for the error of the charge mentioned, which error we would not be inclined to hold harmless because of the fact that in the charge in prior paragraphs thereof appear definitions and references to malice and malice aforethought. While there is a definition of malice and a statement that a killing to be murder must be upon malice aforethought, these are in nowise coupled up with or referred to in paragraph 8 of the charge above set out, which paragraph patently deprives the accused of his rights, if any, under the law of manslaughter.

Is manslaughter in the case? Said offense is voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause (Art. 1128 P. C.). The existence of sudden passion and of an adequate cause therefor, are issues of fact for the determination of the jury and must appear in testimony. Certain facts are named in our statute, proof of which will be deemed adequate cause, but the broad legal proposition involved is that anything in proof which convinces the jury that it would cause that degree of anger, rage, resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection, should be held adequate cause.

Looking to the facts in this case as we understand them, none of those things named as adequate causes under Art. 1131, P. C., are found in the record. Deceased, a widowed tenant on the land of appellant, lived in abject poverty with her minor children. The testimony of the State witnesses shows that some weeks prior to the alleged homicide appellant became very angry at Jim Jones, the oldest son of deceased, and then threatened, to whip hell out of him but refrained, saying that he would have to pay a fine for it, but that later he would get a limb and whip hell out of him and would whip the whole damn mess and run them off the place and that it would not cost him anything. Three of the children of deceased testified for the

State. They agree in their testimony in the main the substance of which is as follows. On the night in question appellant came to the house of deceased, fired his gun off twice before reaching said house, calling out and telling those damn bullies to put out the light or he would shoot it out before he entered the house. When he came in he inquired of the boys if they were going 'possum hunting with him and received a negative answer. He then stayed around for a few minutes and wanted to know where deceased was, and being told that she was in bed with her little girls in an adjoining room, he went to the door of said room and kicked upon it. The oldest boy called to his mother to put on her clothes and get up and come in, which she did. Appellant among other things said to the oldest son, accompanying said statement by pointing his gun at said boy, "Do you see your damn brains lying out there on the fence?" He also then walked around by the side of the boy and told him that he was not going to hurt him, that he was the best friend he had in the world, but asked the boy if it was true that he was figuring on moving away and was told that it was true, and appellant then said that they could move Monday morning and could have his team to move with, and that they could not move any too soon to suit him. He then struck Jim Jones and knocked him down. Deceased remonstrated and asked him what he meant, and according to the testimony of the children he he said, "Shut your G—d d—n mouth or I will do you the same way," and picked up a chair and hit her and knocked her down. He struck her on the back and neck. The chair was a raw-hide bottom, hickory frame chair with a piece of board nailed across the front. Deceased got up or was carried away into the next room. Appellant then struck Jim Jones again and knocked him down, and Walter Jones, a fourteen year old son, who was sitting there with one shoe off and one on, ran away from the premises and to the home of a neighbor who lived about a mile away. This neighbor and his family testified that Walter came to their house on that night with one shoe off and one on. The children said when appellant came to their mother's house that night he was drinking, and while he was there took another drink of a liquor called Lyko. Other witnesses for the State testified that they saw appellant that afternoon and that he was drinking. Still other witnesses testified for the State that that night and about the time the children claim their mother was struck and killed by appellant, that they heard appellant talking over a party line telephone with his father and telling him that he had a sick horse and wanted him to come at once to his house. Another State witness testified that some time after the homicide he had a conversation with appellant in which appellant made to him the following statement:

"He says, 'You ought to wait until the 25th; they have got me for killing a God damn woman. I killed the God damn old bitch;

and they think they are going to get me in the penitentiary, but they won't, because they haven't got the evidence.'"

For the defense a number of relatives of the appellant were introduced who testified to the sickly, frail character of the deceased and that she was subject to spells. Appellant took the stand in his own behalf and testified that on the night in question he went to the home of deceased for the purpose of going possum hunting with her boys. That the two boys were sitting by the fire and when he asked if they were going, one said, yes, as soon as he could put his shoes on. That in a few minutes Mrs. Jones came into the room and asked him if he had snuff which he had gotten for her, and upon his answer in the affirmative, she asked him for it, and then squatted down by the fire and made an ugly noise. He stated that Jim then said to his mother: "G—d d—n you, if you do that around me I will stamp hell out of you," and that Jim started around toward her and he shoved Jim back and slapped him, and that deceased ran into the house, and that one of the girls called out presently and said, "Come in here Jim, mother has fainted," and that he told Jim to go into the house and see what was the matter with his mother, and accompanied him to the door and told him to light a lamp and Jim said they did not have any oil. Appellant said he then went to his own house and got a lamp and returned with his wife, bringing some camphor and liniment, and that they rubbed deceased who was still alive but unconscious when they got back, but that shortly afterwards she died. Appellant's father came to the house a little later. Appellant denied having telephoned for his father to come. Upon cross-examination he stated that neither he nor Jim nor Walter ran into or struck or hit deceased with anything. The State in rebuttal showed the good health of deceased, and that on the day preceding the night of the homicide she and her two little daughters had picked 172 ponds of cotton and had been picking for the same people for a week.

The books are full of cases holding that where there is no evidence upon which to predicate a charge submitting an issue, it is not error to refuse such charges or to fail to give such instruction. Branch's Ann. P. C., p. 1135. Neither from the testimony of the State nor that of the defense is there an inference that the killing resulted from an uncontrollable emotion of appellant's mind or that there was any adequate cause from which such emotion might possibly have arisen. State witnesses are in agreement upon the proposition that following a threat directed at her, appellant struck with a chair, and that the utmost provocation therefor was her remonstrance against his unprovoked assault on her minor son. Appellant swears positively that she did nothing to him nor he to her, and that all that occurred on that occasion in her presence was that when Jim started at her, after she had made the ugly noise, he shoved Jim back and slapped him and that deceased ran out of his sight.

We are forbidden by the terms of Article 743 of our Code of Criminal Procedure to reverse cases for errors in charges unless we are able to conclude such errors productive of harm to the rights of the accused. We can not escape the conclusion that this case is within that class where no harm resulted from the charge as given. The court had already defined malice aforethought, and told the jury that a killing upon malice aforethought was murder, and the charge as given was applicable to the only grade of homicide reflected by the facts. There being no manslaughter raised by the testimony, no ground exists for complaint that said charge as given denied to appellant the right to have the jury consider the issue of manslaughter.

That Dr. Neal, who had qualified as an expert, was permitted to testify that from his examination of the wounds or discolorations found by him on the body of deceased, same could have been made by a chair with a board nailed on the front an inch thick and two or three inches wide in the hands of a man such as appellant, presents no error. Ozark v. State, 51 Texas Crim. Rep. 106; Hardin v. State, 51 Texas Crim. Rep. 559; Kirk v. State, 37 S. W. Rep. 440; Sebastian v. State, 41 Texas Crim. Rep. 248; Tune v. State, 49 Texas Crim. Rep. 445; Betts v. State, 60 Texas Crim. Rep. 631. We do not think the question as to whether the injury could have been inflicted by said chair, one of which the jury were as competent to judge as the physician, and are of opinion that the case of Tolston v. State, 88 Texas Crim. Rep. 269, 225 S. W. Rep. 1098, is not in point.

The conduct of appellant toward the son of deceased preceding and immediately following the assault upon her, was res gestae of the transaction and reflects a heart fatally bent on mischief, and also the animus and ill-will of appellant toward deceased as well as her son. It was not error to permit same in testimony.

Finding no error in the record, an affirmance is ordered.

*Affirmed.*

ON REHEARING.

June 6, 1923.

LATTIMORE, JUDGE.—Upon the proposition that any killing resulting from a sudden quarrel involves manslaughter, and that the instant killing was of that kind, appellant bases an argument and citation of authorities in support of his motion for rehearing. We regret we can not agree with appellant's premises in this matter, and, therefore, conclude that there is no need to review his authorities. From the testimony of neither side does it appear that this killing resulted from a sudden quarrel. We stated in our original opinion the substance of the immediate surroundings of the homicide. A review of the facts leads us to no different conclusion. Neither the mother, who was killed by him, nor her children engaged in any quarrel or altercation with appellant upon which, under any rule known to us, manslaughter

could be predicated. Threats by appellant prior to the night of the homicide,—demonstration with a gun both outside and inside of the house of deceased on said night, followed by an apparently unprovoked assault on the young son of deceased and upon her after appellant's entrance into the house, all appear from the State's case. No assault on deceased at all and only an interference in her behalf against an attempted assault upon her by her son,—appears in the case as made by the defense. This is no killing resulting from a sudden quarrel.

Appellant insists, however, that because the killing was by a blow from a chair, a weapon not per se deadly, that manslaughter was necessarily in the case and hence paragraph 8 of the charge quoted in our original opinion was erroneous, and our conclusion that there was no manslaughter in the case was likewise erroneous. Reliance is had on Johnson v. State, 60 S. W. Rep. 48; Fitch v. State, 37 Texas Crim. Rep. 500; Taylor v. State, 51 S. W. Rep. 1106, and Arts, 1147, 1148, 1149 and 1150 of Vernon's P. C. It is not our understanding that by any of said articles it was intended to change the statutory definitions of manslaughter or to make any intentional killing manslaughter in the absence of sudden passion based on an adequate cause. This line of authorities was reviewed in Merka v. State, 82 Texas Crim. Rep. 550, 199 S. W. Rep. 1123, and a conclusion reached adverse to the contention of appellant. A homicide if intentional or the result of injury cruelly inflicted, is either murder or manslaughter, dependent on the mental attitude of the slayer and not on the character of weapon used. In such case if the motive be malice, the killing is murder; if it be sudden passion arising from an adequate cause, it is manslaughter. If there be anything in any of the authorities cited by appellant, or any other cases decided by this court which hold that manslaughter is a necessary issue in a case where the killing, though intentional, is with a weapon not likely under ordinary circumstances to produce death, such authorities will be overruled. This also disposes of the third contention made by appellant, viz: that he was entitled to a charge on manslaughter under the articles above mentioned regardless of whether there was sudden passion or adequate cause. Under his third proposition appellant cites Grant v. State, 65 Texas Crim. Rep. 266, 143 S. W. Rep. 929. In our opinion appellant misapprehends the effect of the case. It seems that the trial court did not charge on any grade of assault as contemplated by Article 1149 P. C., and this court in its opinion quoted a special charge and said same should have been given, which contained and presented the substance of said article and instructed the jury that if the homicide was committed under the influence of sudden passion by means not in their nature calculated to produce death and that the accused did not intend to kill the deceased, that he would not be guilty of manslaughter but might be guilty of an aggravated assault.

We do not understand anything in said decision to hold contrary to the views we have here expressed. It does not seem to be the purpose of Article 1149, *supra*, where there is a killing by the use of means not ordinarily calculated to produce death and without intent to kill, that in order to reduce this below the grade of an unlawful homicide the sudden passion producing the act must be such as renders the mind incapable of cool reflection, nor is it said that it must result from an adequate cause. There seems no necessity for discussing this article further in this connection. In an appropriate case it has application, but none here. The court in the instant case gave to the accused the full benefit of a charge submitting the law of Article 1150 and told the jury that if the accused struck deceased with a chair without the intention of killing her, whether they found the chair was a deadly weapon or otherwise, they could only convict him of an aggravated assault.

Being unable to agree with the contentions of appellant, his motion for rehearing will be overruled.

*Overruled.*